**Affirmed and Majority and Dissenting Opinions filed August 30, 2012.**



In The

# Fourteenth Court of Appeals

## NO. 14-11-00530-CR

**JOHN MATTHEW CONE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 185th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1282374**

# M A J O R I T Y   O P I N I O N

Appellant John Matthew Cone was convicted of intoxication manslaughter and sentenced to eight years' incarceration. Appellant argues in one issue on appeal that the trial court violated appellant's constitutional right to confrontation by admitting, over appellant's objection, a lab report and testimony regarding appellant's blood alcohol concentration (BAC), which was calculated from the results of a blood test performed by an analyst who did not testify at trial. We affirm.

BACKGROUND

**I.  The Accident**

Around 9:00 p.m. on October 13, 2010, appellant was driving a Chevrolet Z71 pickup truck with a ten-inch lift kit and unusually large tires in the northbound lane of a two-lane road with shoulders on either side. Raymond Wike, the driver of a vehicle in the northbound lane behind appellant, testified that appellant slowly drifted twice toward the shoulder of that lane, once over the solid white line separating the lane from the shoulder, then again over the white line as well as the "drunk bumps" or "rumble strips" approximately two feet from the edge of the pavement. Raymond slowed down to allow some space to develop between his car and appellant's truck. Moments later, just as a Yukon SUV, a Denali SUV, and a Mitsubishi Gallant approached in the southbound lane from up ahead, appellant's truck drifted to the left and crossed the yellow line running down the middle of the road "by a tire width."

Appellant's truck collided with the Yukon headlight-to-headlight, causing the wheel assembly for the Yukon's left front tire to crumple into the vehicle and the driver to lose control. The disabled Yukon veered into the northbound lane after appellant's truck continued past it, which forced the vehicle traveling behind appellant to swerve into the ditch beside the northbound lane to avoid a collision. The Yukon skidded back into the southbound lane and then onto the shoulder of that lane, where it came to rest.

As appellant's truck collided with the Yukon, the driver of the Denali behind it attempted to get out of the path of appellant's truck by braking and veering to the right. The Denali was halfway into the grass beside the shoulder of the southbound lane when appellant's truck sideswiped it on the driver's side less than two seconds after colliding with the Yukon. The impact caused the Denali to spin out of control and into the grass beside the shoulder of the southbound lane, where it came to rest.

Immediately after sideswiping the Denali, appellant's truck, which was completely in the southbound lane at that point, collided head-on with the Gallant and rode up on the

Gallant's hood and windshield before recoiling backwards.[1]  The driver of the Gallant, Brittany Mapstone, was killed instantly from the impact.[2]

Police were able to retrieve data about the accident from the air bag control modules of the Yukon, the Denali, and appellant's truck.[3]  Harris County Sherriff's Deputy David Pearson testified that recording devices associated with such modules "record crash data, such as change in velocity of the vehicle, or in some cases the speeds for the vehicles" during "the last . . . five seconds or two and a half seconds before the signal came to deploy the airbags."  The function of the module is to "sense acceleration changes or jerks," then analyze the sudden change, and based on certain calculations, "make[] [a] decision very quickly as to whether or not air bags need to be deployed."  Once a "deployment event" occurs, the recording device is capable of preserving data regarding that event, as well as one additional subsequent event.

Based on the data from the air bag control module in appellant's truck, police were able to determine that appellant was traveling above the posted speed limit of 55 miles per hour at a speed of 60 and 61 miles per hour[4] before the impacts with the Yukon and the Denali, respectively, and did not touch his brakes before or after those collisions.  The data also showed that appellant accelerated just prior to colliding with the Yukon.  Because the recording device associated with the air bag control module in appellant's truck is only capable of recording two significant events but not a third, police were

---

[1] Our recitation of these events is based on testimony from Harris County Sherriff's Deputies Jeremy Thomas and David Pearson and defense expert Cam Cope, who reconstructed the accident based on certain evidence discovered at the scene—such as marks on the road and surrounding area, damage to and data from the vehicles, and testimony from witnesses.

[2] Harris County Institute of Forensic Sciences Assistant Medical Examiner Darshan Phatak testified that Brittany Mapstone suffered an atlantooccipital dislocation, or a shearing of the spinal column inside the vertebrae at the top of her spine due to sudden forward or backward movement of her skull, which would have killed her instantly.  She also suffered a torn descending aorta, a partially pulpified liver, and numerous other broken bones, lacerations, and contusions.

[3] Police were unable to retrieve data from the air bag control module in the Gallant.

[4] Deputy Pearson acknowledged that appellant's truck had after-market, large tires that would affect the recorded speed if adjustments to the speedometer had not been made when the tires were put on the vehicle.

unable to retrieve any information regarding the impact with the Gallant; however, Deputy Pearson estimated that appellant was traveling between 44 and 57 miles per hour when he collided with the Gallant.

## II.     The Issue of Appellant's Intoxication

Firefighter paramedic Clinton Cooke arrived at the scene of the accident at 9:14 p.m.  After determining that Brittany Mapstone did not survive the collision, Cooke approached appellant's truck, where a volunteer fire fighter was keeping appellant's head stable by holding it from behind in the back seat.  Cooke confirmed that appellant was conscious with open airways, then returned to his emergency vehicle to prepare his equipment while he waited for emergency crews to extricate appellant from his truck with hydraulic rescue tools, or the Jaws of Life.  Approximately ten minutes later, appellant was extricated, placed on a stretcher with a backboard, and brought over to Cooke.  Cooke testified:

> I heard a bunch of yelling. . . .  I couldn't make out the words.  It didn't appear—there was—just sounded combativeness, [sic] sounded something that was abnormal for the scene. . . .  It was going back and forth between [appellant] and the crews that were attempting to get [appellant] secured to the board. . . .  Once I heard the yelling, I stepped out of the medic unit to find out what was going on and why—what was prolonging the getting him secured to the board.  At that time I learned that he didn't— he didn't want to lay down.  He didn't want to cooperate with them wanting to assist him. . . .  At that point—he just didn't want to be there.  He wanted to leave.  He didn't need us. . . .  [H]e was just real combative, not wanting to participate in his own care.

> *                    *                    *

> I could smell what to me smelled like alcoholic beverages. . . .  He is—literally we're standing right next to each other.  He's on the stretcher on the board.  They're trying to get him to lay down and get him secured and he's wanting to just pull the stuff off they're trying to secure him with.

Cooke testified that he made the following notation in his medical report:

> Patient advises he has been out drinking though he doesn't remember how many he has [sic].  There's a[n] obvious smell of [alcohol]

4

when close to the patient that increases when he speaks.

Cooke explained: "My concern was a head injury. . . . Combativeness is a sign of a head injury." However, when Cooke informed appellant that Brittany Mapstone did not survive the accident, Cooke testified that appellant "got real quiet." Cooke concluded at that point that appellant's combativeness probably was not from a head injury because "[c]ombativeness from a head injury isn't going to change based off questioning. Your body doesn't know what it's doing at that point because of the pressure of the brain. So, any kind of information that you gathered wouldn't change your demeanor."

Harris County Sherriff's Deputy Jeremy Thomas was also at the scene and testified that when he learned that alcohol may have been involved in the accident, he instructed another deputy to get into the emergency vehicle with appellant to perform a horizontal gaze nystagmus test, a type of field sobriety test. However, because the test requires the use of both eyes, and because appellant's right eye was swollen shut from an injury sustained in the accident, Deputy Thomas testified that it was not possible to perform the test.

Appellant was transported by helicopter to the Memorial Hermann Hospital emergency room. Life Flight crewmember George Herbert, III, testified that when appellant was loaded into the helicopter, he was "rather uncooperative":

> [A]s soon as we loaded him in the aircraft and started to get up into the air and in flight, he started—he continued yelling at the top of his lungs that he can't breathe, he can't breathe.[5] He continued grabbing at equipment, which, more specifically, above his head was a ventilator that weighs about 20 pounds or so and if you pull at it, it will fall on you. So, he was grabbing at equipment that is attached to the wall and whatnot and in addition to that, I was trying to establish a line on him as well. So, it was a bit of a struggle.

However, Herbert acknowledged that he made no notes in his report about whether he

---

[5] Herbert explained that it was important to him to note that the patient was yelling at the top of his lungs because, given that screaming requires a large amount of air, the note gave "a better picture of the patient and his complaint of ["]I can't breathe["] as to whether or not the patient has a good enough volume to scream or if he can barely get a whisper out . . . ."

smelled alcohol on appellant, or whether anyone from the scene of the accident informed Herbert that alcohol may have been a factor in the collision. Herbert testified that the fact that he did not make such a note does not indicate that he or anyone else did not smell alcohol. He stated: "I remember the patient fitting the description of someone who was possibly intoxicated."

Appellant was admitted to the Memorial Hermann Hospital emergency room at 9:50 p.m. The State introduced to the jury appellant's medical records, in which various notes indicate that appellant was "clinically intoxicated" at 10:15 p.m., "extremely intoxicated" and "incoherent" at 12:45 a.m., and "heavily intoxicated" at some point during the time he was admitted and the time he was discharged the following morning. Appellant's medical records also reflect that "[n]o acute traumatic brain lesion [was] demonstrated" and that appellant suffered from "[n]o intracranial abnormality."

Registered Nurse Natalie Masson testified that when appellant was brought in, he was "uncooperative," "belligerent" and had to be restrained for his safety and the safety of hospital staff.[6] She noticed that he "did have a strong odor of alcohol" and was "lethargic," and she believed him to be intoxicated and "very altered." She testified: "Throughout the night, well, when he came in, he did have some slurred speech. Like I said, lethargic, but as the night went on, we gave him some fluid, he became more coherent." Masson acknowledged that she had never met appellant before that night and was not familiar with appellant's normal behavior. Appellant consented to a blood draw performed by Masson at 11:12 p.m., and a sample of appellant's blood was given to Harris County Sherriff's Deputy Ramon Gutierrez and later tested for alcohol content.

Deputy Gutierrez testified that he was assigned to visit appellant in the emergency room to assess whether he was under the influence of alcohol or drugs. Deputy Gutierrez

---

[6] Masson explained that she remembered her encounter with appellant specifically because he asked her "if he had injured somebody or hurt somebody in the accident. I told him, Sir, I don't know. Because we don't give that kind of information out. And then when he was leaving, he asked me again, did he kill that girl in the accident. And I just told him, No, I don't know. . . . We don't tell people things like that."

6

testified that the first question he asked appellant was his name, and that he had to ask appellant twice because "his speech was pretty thick and slurred; so, he had to repeat it." He testified further:

> A. Well, since I was standing there next to him and I got the odor of alcohol, the next question was, you know, How much have you had to drink?
>
> Q. Were his eyes open or closed at this point?
>
> A. They were still closed. And when I asked that question, he opened his right eye—or his left eye, I'm sorry—and he looked at me and . . . he didn't answer . . . .
>
> Q. Does he open his eye at this point?
>
> A. Yes. He saw me.
>
> Q. He saw you?
>
> A. Yes.
>
> Q. Were you in full sheriff's deputy uniform at this point?
>
> A. Yes, ma'am.
>
> Q. After he opened his eye and he responded or he would not respond to your question about alcohol, what did he do with his eye?
>
> A. He closed it.
>
> *    *    *
>
> Q. Okay. After you asked him how much to drink, what was kind of the next question that you asked him?
>
> A. *I asked him . . . if he had been involved in a crash and he shook his head and said, No.*[7]
>
> Q. What was the next question you asked him?
>
> A. I then asked when was the last time he had ate anything and he said, I do not know.
>
> Q. Did you ask him anything else?
>
> A. I then asked him what kind of vehicle he was driving and he would not

---

[7] Emphasis added.

7

answer.

Deputy Gutierrez concluded that "based on understanding that—of how the crash occurred and what I observed at the hospital with—and smelled the odor of alcohol, the slurred speech, I determined that it was possible that he was under the influence of alcohol or drugs."[8] Deputy Gutierrez placed appellant into custody in the hospital at 10:50 p.m.

The State showed the jury an itemized bill and a signed receipt from Iguana Joe's Mexican Restaurant from the night of the accident. The receipt bears appellant's signature with an extra "e" on the end of his last name, and the bill shows one burrito dinner, one summer special dinner plate, four 20-ounce "Cadillac Ritas," three shots of "Cuervo Gold" tequila, and one shot of "Goldschläger." The bill shows a timestamp of 8:41 p.m., and the signed receipt shows a timestamp of 8:44 p.m., approximately fifteen minutes before the accident occurred. The jury heard testimony that a standard-size mixed drink is approximately six to eight ounces, and that each "Cadillac Rita" is the equivalent of "somewhere above three times what a normal size drink would be."

Eliabeth Martinez, the manager of Iguana Joe's, testified that she witnessed appellant sitting at the bar with a woman the night of the accident, but that she did not know who drank the alcoholic beverages on the bill introduced by the State and had no reason to believe appellant was intoxicated. She explained that customers sometimes "buy a drink for the other people[]" in the restaurant. She testified that the house margaritas contain tequila, although she was not sure how much alcohol is in one 20-ounce serving, and the margaritas on appellant's bill each contain an additional one third of an ounce of tequila and an alcoholic orange liqueur. She also testified that Iguana Joe's imposes a two-drink limit for the 20-ounce margaritas because "that's too much alcohol," and that it is not possible that appellant drank more than two 20-ounce

---

[8] However, Deputy Gutierrez acknowledged that he was not familiar with appellant's normal speech patterns, and that the odor of an alcoholic beverage standing on its own would be insufficient to give rise to probable cause to arrest someone for driving while intoxicated.

8

margaritas because it would have been against the rules.

Raymond Wike, the driver of the vehicle that had been traveling in the northbound lane behind appellant when the accident occurred, testified that although he noticed appellant drifting out of his lane and his wife cautioned him to give appellant room, Raymond did not believe appellant was intoxicated at that point. He explained:

> Well, after he swerved over the second time, I just seen him swerve over and then he got back into his lane, I mean, pretty promptly, in my opinion, and then continued to drive northbound, fairly straight. He wasn't, you know, all over the road. He wasn't driving really sloppy but it wasn't long after that that he had swerved to the left side.

*        *        *

> [After the second time appellant drifted over the white line,] I do notice that he's swerving, but now I'm thinking that it's not the radio, maybe it could be reading, cell phone. Because if you—if you're drunk and you drive, you'll seem to notice someone, they'll be—they'll take their full lane. I don't know if y'all understand what I mean by that, but they'll be from the yellow line to white line, they'll be all over the place. . . . That's not what I seen.

*        *        *

> He didn't seem like a[n] intoxicated driver. Maybe sleeping, texting, reading, fooling with the radio, maybe he dropped a lit cigarette. I mean, I have no idea what he was doing but I could tell that his attention at the time that he swerved was not on the road and then after he corrected into his lane, he was driving, you know, at least reasonable, to say the least.

Appellant's blood sample was tested by the Harris County Institute of Forensic Sciences. Toxicologist Meagan Ocanas testified that based on the results of that test, she calculated that appellant's BAC was 0.19 grams per 100 milliliters of blood when it was taken at 11:12 p.m., or 0.11 grams more than the statutory per se definition of "intoxicated." *See* TEX. PEN. CODE ANN. § 49.01(1)(B), (2)(B) (West 2011).[9] Ocanas testified that, based on her calculations and assuming that appellant began drinking at 5:00 p.m., appellant must have had approximately 14 standard-size alcoholic drinks

---

[9] The statutory per se definition of "intoxicated" is 0.08 grams or more per 100 milliliters of blood. *See* TEX. PEN. CODE ANN. § 49.01(1)(B), (2)(B).

before he stopped drinking at 8:44 p.m., and had an estimated BAC of approximately 0.20–.21 at the time of the accident.[10]

## III.  Appellant's Theory at Trial

Although appellant challenged the extent of his intoxication through cross-examination, the main thrust of his defensive theory was that, regardless of his state of intoxication, a catastrophic failure of a ball joint attached to his left front wheel caused it to separate just before the first impact, rendering him a passenger in his truck without any control over it.  Appellant presented the expert testimony of Cam Cope, the owner of Auto Fire and Safety, an accident reconstruction facility that stores, maintains, tests, and analyzes vehicles that have been "involved in impacts."  Cope opined that the left front tire of appellant's truck, which was found beside the shoulder of the northbound lane just north of the point of impact with the Yukon, came loose prior to the accident because of weak ball joints, rolled underneath appellant's truck, and caused the accident.  He testified:

> The dual ball joints are where, in a particular vehicle such as this one, you're trying to raise it up and you have to change the suspension so it has a ball joint at the top and it has one at the bottom.  They're both pushing at this particular angle so that it holds the wheel in there.  So, if you have a ball joint, say, at the top that is weak, that tire begins to lean one way or the other.  So, you would notice that you have a tire that's going down the road and it may wobble back and forth.  It may have a change in what it's doing as far as how you can steer this vehicle with a tire that's not running as it was designed.

> \*                          \*                          \*

> Once it begins to lean, it will not drive straight as it was designed. . . .  Eventually the tire is going to fold under the vehicle and in that particular time, the vehicle will either veer left or right. . . .  I believe in this case, looking at the vehicle, that it was the upper ball joint that is

---

[10] During cross-examination, Ocanas acknowledged that an individual with a BAC of 0.20–.21 may exhibit certain signs of intoxication, such as "dizziness," "disorientation," "[v]omitting," "dysphoria," and "impaired balance," but testified that, depending on that person's tolerance level, "[y]ou wouldn't have to see all of those symptoms."

10

failing on it and it's causing that [wheel assembly] to roll underneath.

Cope testified that the wheel assembly could not have been on appellant's truck when it impacted the Yukon because the alloy rim and tire would have been damaged if they had collided with the Yukon, and Deputy Thomas indicated that the wheel showed no signs of such damage.[11] Cope also opined that, on the Yukon, the absence of any damage that would have been caused by a tire indicated that appellant's left front tire already had separated from appellant's truck before it impacted the Yukon.

Cope concluded: "Once [appellant's] tire began to fail, he didn't have control over this particular vehicle. Once the left front tire was rolling under and failing, it comes off the ball joint, he's no longer able to control this vehicle. . . . [W]hether he's texting or drinking, the vehicle is not controllable."

Fred Bryant, the manager of National Tire & Battery in Atascocita, Texas, testified that appellant brought his truck in for a wheel alignment on September 20, 2010, about three weeks before the accident. Bryant testified that service manager Kevin Sullivan informed Bryant that one of the ball joints on appellant's truck did have "some wear in it." Sullivan also testified and confirmed that he remembered the ball joints were "bad," but that appellant did not have the ball joints repaired. Sullivan testified that if the tire had become separated from appellant's truck as a result of one of the impacts rather than an independent ball joint failure, the pictures of appellant's truck after the accident would show "damage to this lower control arm, much more around the hole where the ball joint belongs," and that the pictures do not show such damage.

Deputy Thomas testified that the tire could not have come off appellant's truck before the first impact because "[t]here's no marks on the road to back that up. . . . [I]f a tire drops—tire comes off, front end drops, it's going to mark the road." He opined that the tire must have separated as a result of the first impact because "if you look prior to impact with the [Denali], you see the line on the road that starts to form." Deputy

---

[11] The wheel was not preserved as evidence and Deputy Thomas was the only individual who observed the tire at the scene, for between 10 and 15 seconds.

Pearson also testified that there were no indications on the roadway that "some degenerative part" of appellant's truck contributed to the initial collision with the Yukon.

Cope acknowledged that the road showed no gouge marks after the tire had separated from appellant's truck. However, he explained that the absence of such marks was consistent with his theory because, just as one witness described,[12] he believed appellant's truck went up on its two passenger-side wheels after the impact with the Yukon before coming back down against and side-swiping the Denali. Cope stated that "[t]he wear pattern to the edges" of appellant's right front tire indicated "that this vehicle was most likely up on two wheels for some distance" before the impact with the Gallant, and that appellant's truck therefore would not have created any marks on the road because of the absence of a left front tire.

The State recalled Deputy Pearson to testify about this theory, and he explained that if Cope were correct about appellant's truck going up on two wheels, "we would see a lot of weight on the right side tires, enough weight to increase or actually be over the weight rating for those tires. That extra weight and friction, that in itself is going to cause a mark [on the roadway], similar to what we see with the weight on an 18-wheeler when it's making a turning movement, just an example." He also testified that the damage caused to appellant's tires was not consistent with Cope's theory, but was instead consistent with damage caused by the final impact with the Gallant.

## IV. The Verdict

The jury was instructed that "a person commits the offense of intoxication manslaughter if the person . . . operates a motor vehicle in a public place" and "is

---

[12] Raymond's wife Toni testified: "So, once my husband got us on the shoulder is when I started paying attention more to the wreck and I noticed that, like, the truck got back into our lane and it went up on, like, two wheels [on the passenger side]. . . . [I]t was obviously out of control, the vehicle was, but I thought personally that [appellant] was doing a very good job of trying to control it. Because, I mean, it was a big truck and we were going, like 55 miles an hour, so. . . . [Y]ou could tell he tried to correct to try to get it back on all four wheels but obviously there wasn't one there to land on. If he would have went the other way, he would have, like, rolled into the ditch, so." However, Toni also testified that appellant's truck had all four tires when it impacted the Yukon.

12

intoxicated and by reason of that intoxication causes the death of another by accident or mistake." *See* TEX. PEN. CODE ANN. § 49.08 (West 2011). The jury was also instructed that "intoxicated" means, among other things: (1) "not having the normal use of mental or physical faculties by reason of the introduction of alcohol"; or (2) having an alcohol concentration of 0.08 or more grams per 100 milliliters of blood. *See id.* § 49.01(2).

The jury deliberated for just over two hours before returning a verdict of guilty on the charge of intoxication manslaughter. After hearing evidence relevant to punishment, the jury assessed a sentence of eight years' incarceration.

In one issue on appeal, appellant argues that the trial court violated appellant's constitutional right to confrontation by admitting, over appellant's objection, a lab report and testimony regarding appellant's BAC, which was calculated from the results of a blood test performed by an analyst who did not testify at trial.

### ANALYSIS

The State introduced both a report and testimony from Harris County Institute of Forensic Sciences Toxicologist Meagan Ocanas regarding appellant's BAC, which Ocanas testified that she calculated from the raw, machine-generated data obtained by non-testifying analyst Andre Salazar. Ocanas testified she neither observed nor participated in the test Salazar performed on appellant's blood. Appellant argues that Ocanas's testimony and report should have been ruled inadmissible as a violation of appellant's constitutional right to confront Salazar because the State never argued that Salazar was unavailable or that appellant had a prior opportunity to cross-examine him. The State responds that (1) the raw, machine-generated data on which Ocanas based her conclusion regarding appellant's BAC is non-testimonial because the machine cannot be cross-examined, and that Ocanas's opinion based on the data therefore does not implicate the Confrontation Clause; (2) the "independent opinion exception" applies, presumably referencing the rule that an expert may base an opinion on inadmissible facts or data. *See*

13

TEX. R. EVID. 703.[13]

## I.    Confrontation Clause

The Sixth Amendment of the United States Constitution provides that "'in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" *McWilliams v. State*, 367 S.W.3d. 817, 819 (Tex. App.—Houston [14th Dist.] 2012, no. pet.) (quoting U.S. CONST. AMEND. VI). The Sixth Amendment Confrontation Clause applies to out-of-court statements introduced at trial. *Id.* (citing *Crawford v. Washington*, 541 U.S. 36, 50–51 (2004)). Under *Crawford v. Washington*, testimonial statements of a witness who is absent from trial cannot be admitted unless the witness was unable to testify and the defendant had a prior opportunity for cross-examination. *McWilliams*, 367 S.W.3d at 819 (citing *Crawford*, 541 U.S. at 53–54).

In the context of forensic testing, the United States Supreme Court in *Melendez-Diaz v. Massachusetts* held that a document reporting the results of forensic analysis that was created specifically to serve as evidence in a criminal proceeding is within the core class of testimonial statements covered by the Confrontation Clause. *Bullcoming v. New Mexico*, —U.S.—, 131 S.Ct. 2705, 2709 (2011) (citing *Melendez–Diaz v. Massachusetts*, 557 U.S. 305 (2009)). Therefore, a live witness must be available for cross-examination in order for such reports to be admitted. *Id.* Although *Melendez-Diaz* did not specifically articulate who qualifies to testify regarding such reports, the United States Supreme Court recently clarified in *Bullcoming v. New Mexico* that the "surrogate testimony" of a scientist regarding findings obtained and documented by a non-testifying analyst in a forensic laboratory report does not satisfy the Confrontation Clause when the testifying scientist neither participated in nor observed the test. *Bullcoming*, 131 S.Ct. at 2710;

---

[13] The State also argues that *Tollefson v. State*, 352 S.W.3d 816, 824 (Tex. App.—San Antonio 2011, pet. ref'd), supports its position that the report and testimony were admissible because, Ocanas, like the supervising analyst in *Tollefson*, wrote the relevant report, not the non-testifying individual. *Tollefson* is distinguishable because the supervising analyst who wrote the relevant report in that case actually was present when the underlying data was obtained by ballistics testing, although she did not personally fire the test shot. *Id.*

*McWilliams*, 367 S.W.3d at 820. When the prosecution elects to introduce such a report, the analyst who created that report becomes a witness the defendant has the right to confront. *See Bullcoming*, 131 S.Ct. at 2710–11, 2716.

In response to *Melendez-Diaz* and *Bullcoming*, Texas courts have struggled with the separate but related question of whether trial courts properly may admit the opinion of an expert whose testimony is based upon but does not merely recite the raw, machine-generated data obtained by a non-testifying analyst. However, because we conclude that appellant could not have been harmed by any asserted error related to the introduction of Ocanas's report or testimony, we need not address this issue.

## II. Harm Analysis

Assuming without deciding that the trial court erred, we review such an error for constitutional harm and must reverse unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment. *See* TEX. R. APP. P. 44.2(a); *Wilson v. State*, 296 S.W.3d 140, 149 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd) (citing *Rubio v. State*, 241 S.W.3d 1, 3 (Tex. Crim. App. 2007)). In reviewing whether an error in admitting out-of-court testimonial statements in violation of the Confrontation Clause is harmless beyond a reasonable doubt, we consider:

1. The importance of the hearsay statements to the State's case;

2. Whether the hearsay evidence was cumulative of other evidence;

3. The presence or absence of evidence corroborating or contradicting the hearsay testimony on material points; and

4. The overall strength of the prosecution's case.

*Davis v. State*, 203 S.W.3d 845, 852 (Tex. Crim. App. 2006); *Wilson*, 296 S.W.3d at 149. We may also consider the source and nature of the error, the extent of the State's emphasis on the evidence, the relative weight the jury may have assigned to the evidence as compared with the balance of remaining evidence relevant to the issue, and any other factor contained in the record that may shed light on the probable impact of the evidence

on the minds of average jurors. *Wilson*, 296 S.W.3d at 149 (citing *Clay v. State*, 240 S.W.3d 895, 904 (Tex. Crim. App. 2007); *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007)).

We are not simply to decide whether the jury verdict enjoys evidentiary support. *See Scott*, 227 S.W.3d at 690; *Wilson*, 296 S.W.3d at 149. Instead, we consider "the likelihood" that the alleged constitutional error was "actually a contributing factor in the jury's deliberations in arriving at a verdict." *Scott*, 227 S.W.3d at 690. Thus, a *Crawford* error does not require reversal unless there is a reasonable possibility that, within the context of the entire trial, the perceived error "moved the jury from a state of non-persuasion to one of persuasion on a particular issue." *Id.* "Ultimately, after considering these various factors, the reviewing court must be able to declare itself satisfied, to a level of confidence beyond a reasonable doubt, 'that the error did not contribute to the conviction' before [the court] can affirm it." *Id.* at 690–91 (quoting Tex. R. App. P. 44.2(a)).

"If an appellate court rules that a constitutional error in the admission of evidence is harmless, it is, in essence, asserting that the nature of that evidence is such that it could not have affected the jury's deliberations or verdict." *Wall v. State*, 184 S.W.3d 730, 746 (Tex. Crim. App. 2006). Although the most significant concern is the error and its effect, the presence of other overwhelming evidence that properly was admitted and that supports the material fact to which the inadmissible evidence was directed may be an important factor in the evaluation of harm. *Id.* Such is the case here.

Although Ocanas's testimony and report regarding her calculation of appellant's BAC was important to the State's theory that appellant was intoxicated according to the statutory per se definition of intoxication, the State presented extensive evidence regarding its alternative theory that the jury could find appellant was intoxicated if the State proved appellant did not have "the normal use of mental or physical faculties by

16

reason of the introduction of alcohol."[14] *See* TEX. PEN. CODE ANN. § 49.08; *cf. Bagheri v. State*, 119 S.W.3d 755, 763–64 (Tex. Crim. App. 2003) (in evaluating non-constitutional harm of erroneously admitted "retrograde extrapolation" of appellant's alcohol concentration, considering evidence related to State's alternative "normal use" theory of intoxication; fact that the jury's general verdict "made it impossible to determine which 'theory' [of intoxication] the jury relied upon" was not dispositive on question of harm "because evidence to prove intoxication under either definition is relevant to the single question of whether appellant was, in fact intoxicated"). The jury heard evidence that appellant was speeding and drifting out of his lane before the accident, and that instead of braking, he accelerated just before he collided with the Yukon. The jury also heard evidence that appellant smelled of and admitted to consuming an unidentified number of alcoholic beverages.[15] Witnesses testified that appellant was belligerent and confrontational at the scene; emergency personnel opined and medical testing confirmed that appellant's behavior was not attributable to a head injury caused by the accident. Witnesses testified and appellant's medical records reflect that appellant continued to struggle against emergency personnel to the extent that he had to be restrained, and his behavior, speech, and cognitive responses indicated that he was "extremely" or "heavily" intoxicated and incoherent even hours after the accident. Additionally, the State introduced evidence that appellant purchased the equivalent of 16

[14] We assume without deciding that appellant's objection and point of error apply to (1) Ocanas's report, (2) her testimony reiterating the data contained in the report, and (3) the extrapolation testimony based on the report, thus excluding all of the above in reviewing the record for other evidence showing appellant's intoxication. The State urges that appellant did not object at trial about the opinion testimony regarding the extrapolated BAC estimation. Although appellant's counsel sought and obtained a running objection to Ocanas's report and testimony reiterating the data contained in the report, it is true that appellant's counsel clarified for the trial court: "Our issue is not with her opinion." Appellant's brief is even less clear that appellant challenges Ocanas's opinion testimony that goes beyond her reiteration of the data in the report. We need not decide this issue because, even if we assume that appellant's objection and point of error apply to the extrapolation testimony, other cumulative evidence showing the extent of appellant's intoxication compels our conclusion that the assumed error in admitting Ocanas's report and testimony was harmless.

[15] The dissent acknowledges that appellant's receipt showed "four 20-ounce 'Cadillac Ritas,' each with extra tequila or liqueur," but does not mention the additional four shots of alcohol that also appeared on appellant's receipt.

standard-size alcoholic beverages, and paid the bill for these items just minutes before the accident occurred, and that, although appellant was able to calculate an appropriate tip and total his bill, he signed his own name incorrectly.[16] No evidence directly contradicted the State's assertion that, forensic evidence aside, appellant was intoxicated.[17]

Although the jury might have assigned great weight to the BAC calculation,[18] the circumstances surrounding the method by which appellant's BAC was obtained in this case may have rendered such evidence less important in comparison to other extensive evidence showing that appellant did not have "the normal use of mental or physical faculties by reason of the introduction of alcohol" at the time of the accident. Appellant's trial counsel highlighted for the jury that Ocanas was not present during the test and could not testify as to whether Salazar followed proper protocol in testing appellant's blood. Appellant's trial counsel also cross-examined Ocanas about the fact that the gas chromatograph machine used to test appellant's blood detected unidentified substances that should not have been present in the sample,[19] and that a certain critical part of the machine was replaced five times during the fifteen-day period in which appellant's blood was tested. Ocanas agreed that it was "highly unusual" to replace the part at such a rate because it ordinarily lasts up to a year or longer. She acknowledged that her opinions

---

[16] The dissent states that appellant was "given sedatives." While medical records reflect that appellant was "given 1 mg of Ativan," the jury heard no testimony regarding this drug. Thus, there is no record evidence that Ativan is a sedative. There is likewise no evidence of Ativan's purpose or possible effects, or the impact appellant's ingestion of the drug might have on medical personnel's ability to interpret his behavior.

[17] Our dissenting colleague points to the absence of evidence from a field sobriety test or breathalyzer test to conclude that the jury "could have reasonably gone either way" on the issue of appellant's intoxication. However, we decline to adopt a *per se* rule that disregards overwhelming and consistent evidence regarding appellant's appearance of intoxication merely because the State did not also offer a field sobriety test, breathalyzer test, or other evidence of blood alcohol content.

[18] Although the testimony regarding appellant's BAC was elicited from an expert, there is no indication the jurors were predisposed to give such testimony greater weight than the other evidence before them.

[19] However, Ocanas testified that it is not unusual for the machine to recognize unidentified substances for which the analysts are not testing.

about appellant's BAC "are only as good as that machine."

The State referenced appellant's specific BAC three times during closing arguments, then referred to the gas chromatograph as the "gold standard" compared to urine or field sobriety tests, urged that the machine was properly calibrated, and argued that "there's no doubt about the blood." However, the State emphasized that the jury "heard more than enough evidence that [appellant's] intoxication caused that crash." The State recounted the testimony given by the witnesses at the scene and hospital, and encouraged the jury to consider appellant's medical records and the receipt and bill from Iguana Joe's.

The State urged further:

> Let's say that the tire did cause the crash. Let's say the tire did come off beforehand, even though there's no evidence to suggest that it did. Let's go with their argument for a minute.
>
> Don't you know that from every witness you heard out on the scene that night, from the EMTs to the police officers to the civilian witnesses, that if that crash had been caused by that tire, don't you know the defendant's response would have been, Oh, my God, oh, my God, my car went out of control. I am so sorry. Is everyone okay? Oh, my God, the car was possessed. The tire—oh, my God, oh, my God, is everyone okay? And don't you know that is not anything that you heard and it's undisputed that the defendant was belligerent, that he was uncooperative and that he had to be restrained not once but twice.
>
> If that tire had been a problem, he would have been telling you from the beginning but he didn't.[20]

Based on this record, we can determine beyond a reasonable doubt that any asserted error associated with the admission of Ocanas's testimony or report regarding appellant's BAC did not contribute to the conviction. *See* TEX. R. APP. P. 44.2(a).

We also do not believe that the asserted error contributed to appellant's punishment. The majority of both parties' punishment-phase evidence focused on issues

---

[20] The jury, by its verdict, necessarily rejected appellant's defensive theory, which was that—regardless of the degree of appellant's intoxication—no individual could have controlled the direction of appellant's truck once the wheel separated and caused the truck to veer into the path of the Yukon.

other than the extent of appellant's intoxication on the night of the accident. The State presented the testimony of Brittany Mapstone's mother, who testified about losing her daughter and the impact that loss has had on her family and Brittany's young son. The State also called a community supervision officer to explain general details regarding community supervision. Appellant called friends and family to testify that appellant rarely, if ever, consumes alcohol, and that he is a family man who is remorseful about Brittany Mapstone's death. Appellant also called the provider of the ignition interlock device installed on appellant's vehicle, who testified that appellant has had no problem with his supervisory conditions related to the use of that device since the accident.

However, appellant also took the stand and testified that his tab at Iguana Joe's the night of the accident "was split down the middle. It was two [20-ounce] margaritas and two shots." He stated: "I never said I wasn't intoxicated," and "[a]ccording to the law, I'm guilty." He testified further:

> Q. Because [a prison term] is the appropriate sentence when you're a .19 and you drive down the road and wiped out a 21-year-old mother; right? You know that; right? Nobody knows that better than you?
>
> A. According to the law, that's the appropriate sentence.
>
>            \*            \*            \*
>
> Q. Okay. So, tell this jury how many times you think you have driven home drunk?
>
> A. *I can't put a number on it.* I mean just because you're drinking, there have been times when I've shut it down for a couple of hours to sober up and there's been times when I've gotten rides home. I can't put a number on it. [21]
>
> Q. You can't put a number on the amount of times you've driven home drunk?
>
> A. No, I don't have—
>
> Q. I understand. So this was going to happen sooner or later; right?
>
> A. That's not fair to say because people do it for years and years and it never happens to them.

---

[21] Emphasis added.

Q. How long did you do it?

A. I did not have a drink of alcohol from the time I was about 18 years old until the time I was 34, so.

Q. So when you were actually at the bar, you are still maintaining that you got to a .19 after two margaritas and two shots?

A. Yes.

The State did not mention appellant's BAC at any other point during the presentation of the punishment-phase evidence.

The State referenced appellant's BAC in closing arguments once, but primarily emphasized appellant's behavior at the scene of the accident, stating:

> And you know, that's one thing you can be mad, you can be upset that you're getting arrested, that you're drunk, you know, I understand belligerent drunk. What I don't understand and what I can never understand about this case is how you can do that, how you can behave like that when you know, when you know you've killed that girl. Because what did Clint Cook[e] tell you, I told him that girl was dead. I told him that girl was dead. And he knew it and he understood it. Does that slow him down? Nope. . . . And what is his concern? Fight and get me out of here. Let me go. Oh, I can't breathe. It's all about me. That's the person you are considering. The person who couldn't estimate how many times he's driven drunk.

*       *       *

> But there is nobody in this building, there is nobody in this room who knows he deserves to go to prison more than [appellant]. He knows it. He knows you know it. He's prepared. He knows what he did. And he knows the punishment for doing that. When you kill somebody and you are two and a half times the legal limit, driving down a road in a nightmare scenario like this, you go to prison. Two lane highway, drunk, weaving down the road, there is no divider, there is no escape, you go to prison.

Although the State asked the jury to assess appellant's punishment at sixteen years' imprisonment, the jury assessed a lesser sentence of eight years. Based on this record, we can determine beyond a reasonable doubt that any asserted error associated with the admission of Ocanas's testimony or report regarding appellant's BAC did not contribute to appellant's punishment. *See* TEX. R. APP. P. 44.2(a)

Because we conclude that appellant was not harmed by the asserted error, we overrule his issue on appeal and affirm the judgment of the trial court.


/s/      Sharon McCally
Justice


Panel consists of Justices Frost, McCally, and Mirabal.[22] (Mirabal, J., dissenting).

Publish — Tex. R. App. P. 47.2(b).

---

[22] Senior Justice Margaret Garner Mirabal sitting by assignment.