**Opinion issued March 19, 2015**



In The

# Court of Appeals

### For The

## First District of Texas

_____

### NO. 01-13-00831-CR

_____

## WESLEY BERNARD GORDON, Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

### On Appeal from the 183rd District Court
### Harris County, Texas
### Trial Court Case No. 1363672

---

## MEMORANDUM OPINION

A jury found Appellant guilty of the offense of aggravated sexual assault.[1]

After finding two felony enhancement allegations to be true, the jury assessed

Appellant's punishment at life in prison. In one issue, Appellant asserts that the

---

[1] *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(A)(i), (a)(2)(C) (Vernon Supp. 2014).

trial court erred in admitting testimony during the punishment phase of trial that violated his right to confrontation under the Sixth Amendment of the United States Constitution.

We affirm.

## Background

On the evening of August 8, 2003, 77-year-old N.B. walked from her small apartment to the nearby grocery store. N.B. could no longer drive because she suffered from macular degeneration, leaving her visually impaired. N.B. was a widow and lived alone. When she returned to her apartment from the store, N.B. forgot to lock her door. She was sitting at her dining room table when Appellant came in through the unlocked door and grabbed her from behind. He threw N.B. to the floor of her bedroom. As she fell, the broken arm of a chair scratched her face. As she lay on the floor, Appellant bound N.B.'s hands in front of her with the cord from her clock radio.

Appellant then demanded N.B.'s money. After looking in N.B.'s purse, Appellant asked N.B. where she kept the rest of her money. N.B. responded that she had some coins under her bathroom sink. N.B. offered to show Appellant where the coins were located. Appellant responded by punching N.B. in the face a couple of times and told her not to move. Appellant went into the bathroom and took the coins from under the sink.

When he returned to where N.B. lay on the floor, Appellant pulled off N.B.'s shorts and underwear. He turned N.B. on her side and penetrated N.B.'s vagina with his penis. N.B. was scared and remained silent. Appellant sexually assaulted her for approximately 10 minutes, and then he left her apartment. N.B. never saw Appellant's face at any time during the attack.

After Appellant left, N.B. called 9-1-1. When the police arrived, N.B. answered the door. Her hands were still bound with the clock radio cord, and she was naked from the waist down. The responding police officer noticed that N.B. had blood on her thigh and had a bloody mouth. The officer also noticed N.B.'s false teeth and a sock on the floor. N.B. would later recount that she believed Appellant had gagged her with the sock.

N.B. was taken to the hospital for medical treatment. During an examination, the nurse noticed that N.B. had multiple bruises and abrasions on her face, arms, shoulders, torso, and knees. She had linear abrasions on her wrists where she had been tied with the cord. The nurse also noted that N.B. had bruises and contusions to her forehead, face, eye, lower lip.

Before the assault, N.B. had not had sexual intercourse for 30 years. The examination also revealed that N.B. had a tear to her vaginal tissue and had significant tearing to her anus.

During the examination, the nurse used swabs to collect the perpetrator's DNA from N.B.'s vagina. The sample from N.B. was not immediately tested, but it was kept refrigerated in the police property room. The sample remained there until, in 2012, it was submitted for analysis as part of project to test previously untested rape kits. DNA testing of the sample collected from N.B.'s vagina revealed that it contained semen that belonged to Appellant.

After the DNA results were obtained, Appellant was indicted for the offense of aggravated sexual assault of an elderly person. The indictment also contained two extraneous offense allegations, asserting that Appellant had been convicted of the felony offense of theft in 1990 and had been convicted of the felony offense of burglary in 1991.

Appellant's case was tried to a jury in 2013. N.B., who at the time of trial was 87 years old and still living independently in her apartment, testified during the guilt-innocence phase. In her testimony, N.B. described what had occurred during the sexual assault. The State also offered the testimony of the police officer, who had responded to N.B.'s 9-1-1 call; the nurse, who had conducted the forensic examination of N.B.; and the DNA analyst, who testified that it was Appellant's DNA found in the semen collected from N.B.'s vagina.

After deliberating, the jury found Appellant guilty of the offense of aggravated sexual assault.[2] At the beginning of the punishment phase, Appellant pleaded true to the two enhancement allegations in the indictment, admitting he had been previously convicted of the felony offenses of theft and burglary.

The State also introduced extraneous offence evidence, revealing Appellant's lengthy criminal record, spanning from 1989 to 2011. This evidence included judgments of conviction and penitentiary packets, showing that Appellant had been previously convicted of 13 offenses, ranging from theft by check to assault to kidnapping. These documents were offered through a records custodian employed by the Harris County Sheriff's Department. The records custodian explained and reviewed each conviction in her testimony.

The records and the testimony showed the following prior convictions and sentences for Appellant:

- 2011: Assault-family/dating relationship violence, one year in jail;

- 2009: Theft by check, 30 days jail for each;

- 2008: Kidnapping, 2 years in prison;

- 2006: Assault-family/dating relationship violence, 75 days in jail;

---

[2]   A person commits the offense of aggravated-sexual assault if he intentionally or knowingly causes the penetration of the sexual organ of another person, who is 65 years of age or older, by the sexual organ of the actor, without that person's consent. *See id.* § 22.021(a)(1)(A)(i), (a)(2)(C); *see also id.* § 22.04(c) (Vernon Supp. 2014).

5

- 2004: Assault-family/dating relationship violence, 30 days in jail;

- 2003: Credit/debit card abuse, 1 year in jail;

- 2002: Possession of marijuana, 30 days in jail;

- 2001: Evading arrest, 30 days in jail;

- 2001: Assault, 45 days in jail;

- 1991: Burglary of a motor vehicle, 10 years in prison,

- 1990: Two counts of auto theft, 5 years in prison for each count;

- 1989: Carrying a weapon, 30 days in jail; and

- 1989: Unauthorized use of a motor vehicle, 9 months in jail.

The State also offered evidence to prove an unadjudicated sexual assault committed by Appellant in 2002. The complainant with regard to that offense was M.R. By the time of Appellant's trial in 2013 for the instant offense, M.R. was deceased. To prove the extraneous sexual assault, the State sought to offer the testimony of C.L. Mathis, the police officer who had responded to the initial report of the sexual assault, and of J. Mayes, the nurse who had performed the sexual assault examination on M.R.

Appellant objected to the testimony of Officer Mathis and Nurse Mayes on the ground that their testimony, based on what M.R. had told them regarding the sexual assault, violated his right to confrontation under the Sixth Amendment of

the United States Constitution. The trial court overruled the objection and permitted Officer Mathis and Nurse Mayes to testify.

In his testimony, Officer Mathis stated that, in the early morning hours of April 3, 2002, he was on patrol when he was dispatched to a street corner in downtown Houston. He arrived at the location and immediately saw M.R., who was standing on the corner. Officer Mathis testified that he observed that M.R.'s body was "visibly shaking." The officer stated that he also observed that M.R. had a bruise on her face and a cut on her nose. Officer Mathis further observed that dirt was on M.R.'s clothes and her clothing was wrinkled. The officer noticed that M.R. also had leaves on her clothes and in her hair.

Officer Mathis testified that M.R. told him that she had been sexually assaulted. M.R. stated to Officer Mathis that a man had approached her and tried to talk to her. When she walked away from him, the man grabbed M.R., hit her, and dragged her into the bushes where he sexually assaulted her vaginally. M.R. told Officer Mathis that the man wielded a knife during the assault.

Officer Mayes stated that M.R. had shown him the bushes where the sexual assault had occurred. He said that the bushes were only a few yards from where he had found M.R. standing when he had arrived. Officer Mayes testified that he observed that branches on the bushes had been broken.

7

Officer Mathis stated that he had driven M.R. to the hospital. There, she underwent a sexual assault examination by Nurse Mayes.

Nurse Mayes testified that she that observed M.R. had a bruise to her head. Nurse Mayes stated that, although cooperative, M.R. could not make eye contact. M.R. appeared afraid, sad, and "very, very somber." Nurse Mayes indicated that this is a common presentation in a sexual assault victim. Nurse Mayes also observed that "[M.R.'s] clothes were dirty, disheveled. There was some things on the back of her clothes."

Nurse Mayes testified that M.R. described the sexual assault to her. M.R. stated that she had been approached by a man who wanted to talk to her. M.R. walked away, and the man had followed. The man hit M.R. on the head and sexually assaulted her at knifepoint. M.R. had told Nurse Mayes that the man had assaulted her vaginally, anally, and orally. Nurse Mayes testified that M.R. stated that her assailant had been African-American.

Nurse Mayes also testified that she performed a physical examination of M.R. During the examination, Nurse Mayes used vaginal swabs to collect samples from M.R. Through another witness, the State presented evidence showing that the vaginal sample taken from M.R. contained Appellant's DNA.

During closing argument, the State asked the jury to assess the maximum punishment against Appellant of life in prison. The State cited the extraneous

sexual assault against M.R. in making its argument; however, the State twice argued to the jury that, even if it did not believe that Appellant had sexually assaulted M.R., it should nonetheless assess a punishment of life in prison for the instant sexual assault against N.B. In making this assertion, the State emphasized the brutal nature of Appellant's sexual assault of N.B., a 77-year visually-impaired woman. The State also underscored Appellant's extensive criminal history, which included a number of assaultive offenses and kidnapping.

In its closing, the defense pointed out that no evidence was presented to show whether M.R. had a relationship with Appellant at the time of the sexual assault. By pointing this out, the defense was suggesting that Appellant's DNA was present in M.R.'s vaginal swab because he and M.R. had consensual intercourse before her attack by an unknown assailant.

The jury was informed that, because he had pleaded true to the two felony enhancement allegations found in the indictment, Appellant was a habitual offender, subject to a punishment range of confinement in prison for 25 years to life.[3] When it returned its verdict, the jury assessed Appellant's punishment at life in prison. This appeal followed.

In one issue, Appellant asserts that the trial court erred when it permitted Officer Mathis and Nurse Mayes to testify regarding the statements M.R. had made

---

[3] *See id.* § 12.42(d) (Vernon Supp. 2014).

to them relating to the 2002 sexual assault. Appellant claims that permitting this testimony was a violation of his right to witness confrontation as afforded by the Sixth Amendment of the Unites States Constitution.

## A. Confrontation Clause

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The Confrontation Clause prohibits the admission of testimonial statements unless the declarant is not available to testify and the accused had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 1374 (2004); *see Woodall v. State*, 336 S.W.3d 634, 642 (Tex. Crim. App. 2011) (holding that, in reviewing Confrontation Clause challenge, appellate courts must "first determine whether the Confrontation Clause is implicated," i.e., whether out-of-court statement was made by witness absent from trial and was testimonial in nature).

The threshold inquiry for claimed Confrontation Clause violations is whether the admitted statements are testimonial or nontestimonial in nature. *Vinson v. State*, 252 S.W.3d 336, 338 (Tex. Crim. App. 2008). Statements are testimonial if "the primary purpose of the interrogation is to establish or prove past

events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 2273–74 (2006).

Statements made are nontestimonial when made during an interrogation whose objective primary purpose is to enable police to respond to an ongoing emergency. *Michigan v. Bryant*, 562 U.S. 344, 131 S. Ct. 1143, 1154 (2011); *Davis*, 547 U.S. at 822, 126 S. Ct. at 2273. Likewise, when out-of-court statements in the context of an interview are made primarily for the purpose of medical diagnosis and treatment, they are not testimonial. *See Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 312 n.2, 129 S. Ct. 2527, 2533, n.2 (2009) (stating that medical records created for purposes of treatment are not testimonial within the meaning of *Crawford*).

Here, Appellant argues that M.R.'s statements to Officer Mathis were testimonial in nature because, at the time M.R. made the statements, Officer Mathis was not responding to an "ongoing emergency." Similarly, Appellant argues that M.R.'s statements to Nurse Mayes were testimonial because they included facts that were not related to medical treatment but, rather, were to be used for a criminal prosecution. Not surprisingly, the State takes the opposing view.

11

Because we conclude that Appellant was not harmed by any asserted error related to the introduction of M.R.'s statements through Officer Mathis or Nurse Mayes, we need not address whether M.R.'s statements were testimonial. *See Cone v. State*, 383 S.W.3d 627, 637 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (proceeding directly to harm analysis without determining whether admission of complained-of statements violated the appellant's Sixth Amendment right of confrontation).

## B.    Harm Analysis

Presuming without deciding that the trial court erred in permitting the witnesses to testify regarding M.R.'s statements, we review such error for constitutional harm and must reverse unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment. *See* TEX. R. APP. P. 44.2(a); *Rubio v. State*, 241 S.W.3d 1, 3 (Tex. Crim. App. 2007). When we review whether error in admitting out-of-court testimonial statements in violation of the Confrontation Clause is harmless beyond a reasonable doubt, we consider:

1. The importance of the hearsay statements to the State's case;

2. Whether the hearsay evidence was cumulative of other evidence;

3. The presence or absence of evidence corroborating or contradicting the hearsay testimony on material points; and

4. The overall strength of the prosecution's case.

12

*Davis v. State*, 203 S.W.3d 845, 852 (Tex. Crim. App. 2006); *Wilson v. State*, 296 S.W.3d 140, 149 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd).  We may also consider the source and nature of the error, the extent of the State's emphasis on the evidence, the relative weight the jury may have assigned to the evidence as compared with the balance of remaining evidence relevant to the issue, and any other factor contained in the record that may shed light on the probable impact of the evidence on the minds of average jurors.  *See Clay v. State*, 240 S.W.3d 895, 904 (Tex. Crim. App. 2007); *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007)).  The error does not require reversal unless there is "a reasonable possibility that the *Crawford* error, within the context of the entire trial, 'moved the jury from a state of non-persuasion to one of persuasion' on a particular issue."  *Davis*, 203 S.W.3d at 852–53 (quoting *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000).

Applying this test, we hold that any error in permitting Officer Mathis and Nurse Mayes to testify about M.R.'s statements, regarding the extraneous sexual assault was harmless beyond a reasonable doubt.  With respect to the importance of M.R.'s statements, the State did reference and discuss the extraneous sexual assault against M.R. when it requested the jury to assess a life sentence.  However, in so doing, the State was forthcoming that it had the burden to prove the extraneous offense.  After reviewing the facts of the extraneous sexual assault, the

prosecutor communicated to the jury that the extraneous sexual assault was not of great significance with respect to the assessment of a life sentence. In its closing statement, the State averred, "So, did we prove [the sexual assault of M.R.] case to you? I think we did, but if you don't and you want to throw it away, that's fine. It's still a life case." In addition, before discussing the facts of the extraneous sexual assault, the prosecutor also emphasized the following to the jury: "I submit to you, even if you think he's not guilty of [the extraneous sexual assault], if you want to throw that away, it's still a life case."

In other words, the State made clear to the jury that the evidence of the extraneous sexual assault was subordinate to the other evidence supporting an assessment of a life sentence. Thus, it was the State itself which devalued the significance of the extraneous sexual assault evidence and signaled to the jury not to place emphasis on that evidence when deciding Appellant's punishment. As the State pointed out, the other evidence supporting an assessment of a life sentence against N.B. was strong.

The State first stressed the shocking and brutal nature of the sexual assault in this case. It asserted that the facts of the instant case alone support the assessment of a life sentence. The prosecutor argued as follows to the jury:

> It may be that when you heard that the defendant raped a 77-year-old woman, blind woman in her home after tying her up with an electrical cord, right then you may have thought: This is a life case. Based on those facts alone, it's a life case. It may be that when you

14

saw little [N.B.] walk into the courtroom, you thought: If I find him guilty, it's a life case. And, frankly, in Harris County, Texas, nobody should be surprised that if you rape a 77-year-old blind woman after tying her up in her apartment on her own bedroom floor, you're going to get life.[4]

. . . .

Those facts alone are worthy of that kind of sentence, regardless of what the defendant's criminal history is.

As the State emphasized, the evidence presented to the jury, with respect to the sexual assault of N.B., was disturbing. N.B., a 77-year-old visually-impaired woman, was attacked in her home, thrown to the floor, tied up with an electrical cord, punched in the face, and then sexually assaulted by Appellant, who, the evidence at the punishment phase revealed, was 31 years old at the time of the attack. The crime scene evidence included a photograph of N.B.'s dentures lying on the floor of N.B.'s apartment, dislodged during the attack, possibly when Appellant gagged N.B. with a sock.

In addition, the medical evidence showed that N.B. had a vaginal tear and significant anal tearing as a result of the assault. N.B. also had numerous abrasions, bruises, and contusions over many parts of her body. The nurse, who performed N.B.'s sexual assault examination in 2003, testified at the 2013 trial

---

[4]     At this point, the defense objected without specifying the basis. The trial court sustained the objection, instructing the prosecutor to "[s]tay in the record"; however, no instruction to disregard the argument was asked for or given. The prosecutor then continued with his closing statement, as indicated.

that, although she had performed 250 sexual-assault examinations, and it had been 10 years since the examination, she still remembered N.B. and the examination "very well." The nurse stated that this was because it had been one of the "tough" cases that she had handled.

The State also highlighted Appellant's extensive criminal history. The Harris County Sheriff's Office's records custodian, K. Torres, through whom the documentary evidence of Appellant's 13 prior convictions was introduced, discussed individually each of Appellant's 13 previous convictions. This evidence showed that Appellant was first convicted of a felony in 1989 when he was 18 years old. Over the next 22 years, Appellant went on to commit, and to be convicted of, 12 more offenses. Among the sentences for these offenses, Appellant was sent to prison three times and state jail one time.

Appellant's past adjudicated offenses included violent crimes. Appellant was convicted of assault four times between 2001 and 2011, with the last assault in 2011 being felony-level assault. The evidence also showed that Appellant was convicted of kidnapping in 2008 and sent to prison for two years. In short, the evidence revealed that Appellant's offenses had become increasingly violent over time, interspersed with other crimes such as theft and illegal drug possession, and that, when not incarcerated, Appellant would re-offend.

The State elicited testimony from records custodian Torres that Appellant received a one year jail sentence on February 20, 2003 for the offense of credit card abuse. Despite the one year sentence, Appellant was not in jail on August 8, 2003, when he sexually assaulted N.B. The records reflected that Appellant had not served the full one-year sentence. He had been released on June 14, 2003, allowing him to sexually assault N.B. less than two months later.

Lastly, and significantly, the State presented evidence that corroborated M.R.'s hearsay statements to Officer Mathis and to Nurse Mayes regarding the extraneous sexual assault. Specifically, both Officer Mathis and Nurse Mayes testified to observational facts, supporting M.R.'s statement that she had been sexually assaulted. Officer Mathis observed that, when he arrived at the scene, M.R.'s body was shaking. He saw that M.R. had a bruise on her face and a cut on her nose. The officer observed that M.R.'s clothes were dirty and wrinkled. M.R. had leaves in her hair and on her clothing. A few yards away, Officer Mathis saw that the branches on the bushes were broken where M.R. had indicated she was sexually assaulted.

Similarly, Nurse Mayes testified that she observed that M.R.'s demeanor was typical of a sexual assault victim: M.R. was afraid, somber, sad, and did not make eye contact. Nurse Mayes noted that M.R. had a bruise on her face and her clothes were disheveled and dirty.

In light of the evidence (1) revealing the disturbing nature of the instant offense, (2) showing Appellant's extensive criminal history and propensity to reoffend when not incarcerated, (3) revealing the increasingly violent nature of Appellant's offenses, and (4) corroborating M.R.'s statements, we hold that there is no reasonable possibility that M.R.'s statements moved the jury "from a state of non-persuasion to one of persuasion" with regard to Appellant's punishment. *See id.* We therefore overrule Appellant's sole issue.

## Conclusion

We affirm the judgment of the trial court.


Laura Carter Higley
Justice

Panel consists of Justices Keyes, Higley, and Brown.

Do not publish. TEX. R. APP. P. 47.2(b).