

# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-16-00346-CR

Steve **KOU**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 290th Judicial District Court, Bexar County, Texas
Trial Court No. 2014CR8622
Honorable Melisa C. Skinner, Judge Presiding

### OPINION ON REHEARING

Opinion by:    Luz Elena D. Chapa, Justice

Sitting:    Karen Angelini, Justice
            Marialyn Barnard, Justice (concurring in the judgment only)
            Luz Elena D. Chapa, Justice

Delivered and Filed:  November 1, 2017

AFFIRMED

The State's motion for rehearing is denied. On our own motion, we withdraw our August 16, 2017 opinion and judgment and substitute this opinion and judgment in their stead. A jury convicted Steve Kou of continuous sexual abuse of a child. On appeal, Kou contends there is legally insufficient evidence of the "sexual abuse" element of the offense and the trial court erred by admitting inadmissible evidence. We affirm the trial court's judgment.

**BACKGROUND**

Between 2011 and 2014, Kou lived in a house with his son, his son's wife Marcia, his granddaughter S.K., and his ex-wife Patricia. Kou's current wife Pheach lived in La Vernia, but stayed at the house on Mondays and Tuesdays. Kou owned a donut shop in Converse, Texas, at which S.K.'s parents worked with Kou. Patricia would work at the donut shop for about an hour in the morning when she went into work with Marcia.

A few days before her ninth birthday, S.K. told Patricia that Kou would "kiss her down there" and "make her kiss him down there." S.K. also told her mother, Marcia, her private area was hurting, burning, and itching. Marcia discovered a red rash and what looked like pimples on S.K.'s labia. S.K. met with a Bexar County forensic interviewer, Lucy Gallegos, regarding her outcry. A sexual assault nurse examiner (SANE nurse), Cynthia Garcia, also interviewed S.K., conducted a physical examination, and found lesions on S.K.'s labia. Garcia took a swab from the lesions, and sent the sample to a laboratory to test for the herpes simplex virus (HSV).

Kou was thereafter indicted for the continuous sexual abuse of S.K, alleged to have occurred from approximately June 1, 2011, to July 4, 2014. The indictment alleged that during this timeframe, Kou committed two or more acts of sexual abuse against S.K, namely:

> 1. the defendant did intentionally and knowingly cause the sexual organ of [S.K.] to contact or be penetrated by the sexual organ of the defendant;
>
> 2. the defendant did intentionally and knowingly cause the mouth of [S.K.] to contact or be penetrated by the sexual organ of the defendant;
>
> 3. the defendant did intentionally and knowingly cause the sexual organ of [S.K.] to contact or be penetrated by the mouth of the defendant; [and]
>
> 4. the defendant did intentionally and knowingly engage in sexual contact with [S.K.], a fem[a]le child who was not the spouse of the defendant, by touching part of the genitals of [S.K.] with the intent to arouse or gratify the sexual desire of any person.

Kou pled not guilty, and the case proceeded to a jury trial. The jury found Kou guilty and assessed his punishment at sixty years in prison. After the trial court imposed Kou's sentence, Kou filed a timely notice of appeal.

**LEGAL SUFFICIENCY**

In reviewing the legal sufficiency of the evidence, we ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *accord Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). We review the evidence "in the light most favorable to the verdict." *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). "Our role on appeal is restricted to guarding against the rare occurrence when a factfinder does not act rationally," and we must "defer to the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010) (quotation marks and citations omitted).

The essential elements of continuous sexual abuse of a child, as alleged in the indictment, are set out in section 21.02(b) of the Texas Penal Code. TEX. PENAL CODE ANN. § 21.02(b) (West Supp. 2016). Section 21.02(b) provides:

> A person commits an offense if: (1) during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims; and (2) at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is a child younger than 14 years of age.

*Id.* (formatting modified). Kou challenges the sufficiency of the evidence only with regard to the "sexual abuse" element. An "act of sexual abuse" includes intentionally or knowingly "caus[ing] the penetration of the . . . sexual organ of a child by any means," "caus[ing] the penetration of the mouth of a child by the sexual organ of the actor," and "caus[ing] the sexual organ of a child to contact . . . the . . . sexual organ of another person, including the actor." *Id.* §§ 21.02(c)(3),

22.011(a)(2)(A)-(C) (West 2011 & Supp. 2016). An "act of sexual abuse" also includes touching any part of a child's genitals "with intent to arouse or gratify the sexual desire of any person." *Id.* §§ 21.01(2), 21.02(c)(2), 21.11(a)(1).

S.K. testified Kou "put his mouth in [her] private area," and she had "used [her] mouth on his private parts." She also testified Kou "put[] his private in [her] private." S.K. further testified she was "[a]round five" when Kou "started doing these things" to her, and these incidents occurred more than five times over a period of three years. Kou "acknowledges . . . [t]he testimony of a child victim, standing alone, may be sufficient evidence to support a conviction for continuous sexual abuse of a young child," but argues S.K.'s testimony was too vague to support a rational finding of guilt. We disagree. In addition to the above-quoted testimony, S.K. provided consistent details about how Kou usually approached her before these incidents, Kou's penis and ejaculate, where Kou would wash himself afterward, and the usual time and location of these incidents. We hold a rational trier of fact could have found the "sexual abuse" element of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319.

## EVIDENTIARY RULINGS

Kou contends the trial court committed reversible error by allowing two outcry witnesses to testify and allowing the State's expert witnesses to specifically testify the sample taken from S.K.'s labia tested positive for HSV-1 and S.K. had herpes. Generally, we review a trial court's admission of evidence under an abuse of discretion standard. *Watson v. State*, 421 S.W.3d 186, 189 (Tex. App.—San Antonio 2013, pet. ref'd). "The trial court does not abuse its discretion by admitting evidence unless the court's determination lies outside the zone of reasonable disagreement." *Id.*

**A. Outcry Witnesses**

"Article 38.072 creates a statutory exception to the hearsay rule for child victims of certain offenses," including continuous sexual abuse of a child. *Cordero v. State*, 444 S.W.3d 812, 816 (Tex. App.—Beaumont 2014, pet. ref'd); *see* TEX. CODE CRIM. PROC. ANN. art. 38.072, § 1(1) (West Supp. 2016). "Article 38.072 allows the first person to whom the child described the offense in some discernible manner to testify about the statements the child made." *West v. State*, 121 S.W.3d 95, 104 (Tex. App.—Fort Worth 2003, pet. ref'd). Kou complains the trial court erred by allowing forensic investigator Lucy Gallegos to testify about S.K.'s statements describing the alleged offense under Texas Code of Criminal Procedure article 38.072 because S.K.'s grandmother, Patricia, was "the first person" to whom S.K. made an outcry statement concerning Kou's alleged sexual abuse.

Before trial, the State had notified Kou of its intent to present Patricia and Gallegos as outcry witnesses. The trial court held a hearing outside the presence of the jury to determine the admissibility of their testimony. Patricia testified S.K. told her Kou "mak[es] [her] kiss and touch him down here (indicating)," and "kisses her down in her genital area," and he would try unsuccessfully to "put it in" and rubs "it" against her. Gallegos testified S.K. told her that on July 4, 2014, Kou put his penis in her private part and in her mouth, and S.K. told her that at times, Kou would lick "her private." She also testified S.K. stated Kou put "his fingers in her private." Gallegos testified she thought S.K. "experienced a lot of incidents." S.K. testified during the outcry-witness hearing that she gave Gallegos "more detail" and told Gallegos "everything that happened." Kou objected to Gallegos's testimony on hearsay grounds. The trial court allowed both Patricia and Gallegos to testify over Kou's objection.

Even if the trial court erred by allowing Gallegos to testify, we must disregard the error unless it affected Kou's substantial rights. *See Cordero*, 444 S.W.3d at 819-20 (applying TEX. R.

APP. P. 44.2(b) when the declarant testified at trial). Generally, the erroneous "admission of evidence is not reversible error if the same or similar evidence is admitted without objection at another point in the trial." *Id.* at 820. S.K. testified without objection that Kou "put his mouth in [her] private area," she had "used [her] mouth on his private parts," and Kou "put[] his private in [her] private." SANE Nurse Garcia testified:

> [S.K.] had described that the actor had put his genitals in her genitals. She had also talked about how the actor had licked her genitals and had her lick his genitals. And then she also had talked about how the actor was putting his hand in her genitals and how he was sticking his tongue in her mouth, so there was oral-to-oral contact.

Kou did not object to this testimony. Gallegos testified about oral-to-genital, genital-to-genital, and hand-to-genital contact, but the same or similar evidence was admitted without objection at other points during the trial. We hold that even if the trial court erred by allowing Gallegos to testify as an outcry witness, the admission of Gallegos's testimony did not affect Kou's substantial rights and is therefore not reversible error. *See id.*

**B. Expert Witnesses**

We next consider Kou's complaints regarding the State's expert witnesses. The State offered the testimony of two experts to provide opinions establishing S.K. was sexually abused based on S.K.'s medical records and other information provided to them. The two experts were SANE Nurse Garcia and Dr. Natalie Kissoon, a child abuse pediatrician. Kou argues the trial court erred by admitting the experts' testimony that S.K.'s sample tested positive for HSV-1 because there was no evidence showing the lab testing was properly conducted. On appeal, Kou contends the lab test results are unreliable and the experts' testimony about the positive lab test results violated his Sixth Amendment confrontation rights. Characterizing the State's expert witnesses as surrogates for the analyst who performed the lab tests, Kou argues the trial court erred by allowing the State's experts to testify about "their opinions based on that result." On appeal, Kou appears

to complain about the experts' "opinions" that S.K. had herpes, as well as their ultimate opinions that S.K. was sexually abused.

### 1. *Preservation of Error*

We first determine whether Kou preserved error for our review. The State argues Kou did not preserve his Confrontation Clause complaint. "[I]n order to preserve a complaint for appellate review a defendant must have presented to the trial court a timely request or objection with sufficient specificity to apprise the court of the grounds," unless the specific grounds were apparent from context. *Kirchner v. State*, 739 S.W.2d 85, 86 (Tex. App.—San Antonio 1987, no pet.); *accord* TEX. R. APP. P. 33.1(a)(1)(A). "The specificity requirement is met if the complaint made at trial was clear enough to the trial judge so as to permit the trial judge to take corrective action when the complaint was made." *Lovill v. State*, 319 S.W.3d 687, 691 (Tex. Crim. App. 2009). "A complaint will not be preserved if the legal basis of the complaint raised on appeal varies from the complaint made at trial." *Id.* at 691-92.

Kou raised relevancy and reliability objections to testimony that S.K. had herpes in a motion in limine, and the trial court granted the motion. Before Nurse Garcia and Dr. Kissoon testified, the trial court held an expert witness hearing outside the presence of the jury. Kou's trial counsel stated, "[W]e agree that [the experts] should be able to have an opinion as to the whether or not a sexual assault happened or whether or not the evidence they had was consistent with a sexual assault. We agree[] that that would be proper." Trial counsel clarified, "Just to be clear on the record, we are objecting to the admissibility -- the admission of the herpes diagnosis."

Trial counsel also objected to the proffered testimony about the lab test results, and the herpes diagnosis based on the results, because the State did not have a witness to establish a chain of custody and to testify the lab testing and analysis was properly performed. After Kou raised these objections, the prosecution and the trial court discussed the objection:

[PROSECUTION]: . . . Now, [defense counsel] wants to question the reliability of the -- of the lab result, the chain of custody, and he wants -- in fact, ***ultimately he wants an opportunity to confront the people who tested*** -- who tested ***the blood*** or --

THE COURT: *Because there is a confrontation clause*.

[PROSECUTION]: Right. ***He wants to do the confrontation clause; however, the confrontation clause does not apply in this case*** because it was not used -- it was not -- the test was not done for purposes of trial or for purposes of any sort of testimony. It was done based on -- it was done in order to determine and diagnose this child and to treat her.

(emphasis added). In response to trial counsel's clarification of Kou's objection that he was objecting to "the admission of the herpes diagnosis," the trial court stated, "I understand that you are objecting to [the lab test results] having been used for the diagnosis . . . And I'm overruling that objection." When Nurse Garcia testified about the positive lab results, Kou again objected. The trial court referred back to its ruling at the expert witness hearing, and Kou asserted he was raising "the same objections" made during the hearing. The trial court allowed Nurse Garcia to testify about the positive lab results.

It is clear the prosecution understood Kou's objection as raising relevancy, reliability, and confrontation issues and provided an argument in response. It is also clear the trial court responded by specifically referencing the Confrontation Clause during the State's response to Kou's objection, and proceeded to overrule that objection. The State argues that because Kou technically did not raise the Confrontation objection himself, Kou waived the objection. However, our examination of whether error is preserved is "not hyper-technical." *Bekendam v. State*, 441 S.W.3d 295, 300 (Tex. Crim. App. 2014).

On this record, Kou's complaint at trial was clear and specific enough to the trial court so as to permit the trial court to take corrective action when the complaint was made. *See Lovill*, 319 S.W.3d at 691-92. The record shows the trial court ruled the testimony was admissible after

expressly considering whether testimony about the lab test results violated Kou's confrontation rights. The specific grounds for Kou's objections were apparent from context, as demonstrated by the discussion between defense counsel, the prosecution, and the trial court, which expressly ruled on the objections. *See* TEX. R. APP. P. 33.1(a)(1)(A), (2)(A). We therefore hold Kou's objection was sufficiently specific to apprise the trial court of the grounds for his complaint. *See Kirchner*, 739 S.W.2d at 86. But, to the extent Kou complains on appeal that the trial court erred by allowing the State's experts to testify as to their ultimate opinions that S.K. was sexually abused, Kou "agree[d]" at trial that the experts could properly opine "as to whether or not a sexual assault happened or whether or not the evidence they had was consistent with a sexual assault." We hold Kou's complaint is not preserved to the extent it varies from the complaint he made at trial. *See Lovill*, 319 S.W.3d at 691-92.

### 2. Constitutional Error

Having determined Kou preserved error regarding his Confrontation Clause issue, we next determine whether the evidence was admitted in violation of the Confrontation Clause. A "testimonial" statement is inadmissible under the Confrontation Clause unless the witness who made the testimonial statement either: (1) takes the stand to be cross-examined, or (2) is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Burch v. State*, 401 S.W.3d 634, 636 (Tex. Crim. App. 2013). A statement is testimonial if it is "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* Furthermore, "a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial." *Ohio v. Clark*, 135 S. Ct. 2173, 2180 (2015). Although statements to individuals who are not law enforcement officers are less likely to be testimonial than statements made to law enforcement officials, there is no "categorical rule excluding [the former statements] from the Sixth Amendment's reach." *Id.* at 2181. "The

admission of a lab report created solely by a non-testifying analyst, without calling that analyst to sponsor it, violates the Confrontation Clause." *Paredes v. State*, 462 S.W.3d 510, 517 (Tex. Crim. App. 2015). "While the testifying expert can rely upon information from a non-testifying analyst, the testifying expert cannot act as a surrogate to introduce that information." *Id.* at 517-18.

> After the prosecutor addressed the confrontation issue at trial, the trial court responded:

> I never really completely agree with the State on this issue because the whole purpose for having a SANE nurse do the examination is for the possibility that that nurse is going to testify in a proceeding. Otherwise, why would it be a sexual assault nurse examiner? Because a sexual assault is a violation of the law, and, therefore, the whole purpose of the exam is not merely for just treating the child. And this is why, as you know, . . . I disagree with this regurgitation of everything a child says during a sexual assault nurse examination . . . because it is done for the purpose of prosecution later.

However, the trial court ultimately ruled that Nurse Garcia's testimony about the positive lab test results was admissible. We review a trial court's determination of whether a statement is testimonial de novo. *Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006).

During the expert witness hearing, Nurse Garcia testified she is a certified SANE nurse, the training for which involved observing courtroom testimony, and she had testified in court approximately thirty times. Nurse Garcia also testified that "[i]f an incident occurred within a 96-hour time frame, we also can collect evidence, and that we can pass on to the law enforcement agency that is involved if they need that." She explained she examined S.K. on July 16, 2014. According to witnesses who testified before the expert witness hearing, earlier on July 16, 2014, S.K.'s father and uncle called the police to report Kou, and the responding officer referred S.K.'s parents to the "ChildSafe Sex Crimes Unit," where S.K. was interviewed by Lucy Gallegos. Nurse Garcia also stated S.K. had reported sexual abuse and, based on this history, she collected a sample from S.K.'s labia to test for herpes simplex virus. Nurse Garcia admitted she could not have diagnosed S.K. with herpes from the physical examination alone and her final diagnosis was based

on the lab test results. Dr. Kissoon testified during the expert witness hearing that the presence of HSV-1 on a nine-year-old child's genitals "is highly suspicious for sexual abuse."

On this record, the lab test results were reported to Nurse Garcia under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial. *See Burch*, 401 S.W.3d at 636. The State did not call the analyst who performed the lab test to take the stand, testify, and be cross-examined, Kou also had no burden to call the analyst to testify, and Kou had no prior opportunity to cross-examine the analyst. Furthermore, Nurse Garcia testified she could not have confirmed her suspicion that S.K. had herpes without the lab test results, and Dr. Kissoon's testimony that S.K. had herpes was based on Nurse Garcia's diagnosis and information and lab test results contained in S.K.'s medical records. Nurse Garcia and Dr. Kissoon did not testify about their independent opinions and conclusions that S.K. had herpes and did act as surrogates of the analyst to introduce the positive lab results into evidence.

Although the statements made by victims to SANE nurses are, under some circumstances, for the primary purpose of medical treatment, the statement here was made by a lab technician rather than the victim. *Cf. Ervin v. State*, — S.W.3d —, No. 08-15-00025-CR, 2017 WL 3614237, at *11 (Tex. App.—El Paso Aug. 23, 2017, no pet. h.). Whether the primary purpose of such a statement is for medical treatment or for prosecution depends on context. *See Clark*, 135 S. Ct. at 2182. The burden was on the State, as the proponent of the evidence, to show the statement was admissible. *See De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008).

Nurse Garcia testified she questioned S.K. about Kou's conduct for purposes of diagnosis and treatment, but she did not specifically testify why she tested S.K. for herpes. *Cf. Berkley v. State*, 298 S.W.3d 712, 715 (Tex. App.—San Antonio 2009, pet. ref'd) (holding SANE nurse's testimony about victim's reported history was non-testimonial because the SANE nurse "testified a history is obtained to ensure a proper medical diagnosis is made and proper treatment is given.").

Instead, Nurse Garcia testified she was focused on categorizing her exam findings as related to sexual abuse or not related to sexual abuse. She also did not testify whether she or anyone else treated S.K. for herpes after receiving the lab test results, and the record does not show the lab test results were used for anything other than prosecution. Before S.K.'s sexual assault examination, S.K. had already seen a doctor who had rendered a diagnosis and prescribed medication.[1] S.K. also saw Nurse Garcia on the same day—and after—Kou was reported to the police and after the reporting officer referred S.K.'s parents to "ChildSafe Sex Crimes Unit," where S.K. was interviewed. Considering all of the circumstances, the State did not satisfy its burden to show the primary purpose of testing S.K. for herpes was for medical treatment. *See Clark*, 135 S. Ct. at 2182; *De La Paz*, 273 S.W.3d at 680. We therefore hold the trial court's admission of testimony about the positive lab test results and the herpes diagnosis violated Kou's constitutional rights under the Confrontation Clause. *See Paredes*, 462 S.W.3d at 517.

*3. Harm Analysis*

When, as here, the record shows a constitutional error subject to harmless error review, we must reverse unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2(a); *Smith v. State*, 392 S.W.3d 190, 195 (Tex. App.—San Antonio 2012, pet. ref'd). In determining whether admission of evidence in violation of the Confrontation Clause is harmless beyond a reasonable doubt, we consider the following factors: "1) how important was the out-of-court statement to the State's case; 2) whether the out-of-court statement was cumulative of other evidence; 3) the presence or absence of evidence corroborating or contradicting the out-of-court statement on material points; and 4) the overall

---

[1] Nurse Garcia testified in the presence of the jury she never prescribed any medication to treat S.K. for HSV-1, either before or after receiving the positive lab test results. She also testified she did not know whether S.K. was prescribed any additional medication after she received S.K.'s positive lab results.

strength of the prosecution's case." *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007). We "may also consider, in addition to the factors listed above, *inter alia*, the source and nature of the error, to what extent, if any, it was emphasized by the State, and how weighty the jury may have found the erroneously admitted evidence to be compared to the balance of the evidence with respect to the element or defensive issue to which it is relevant." *Id.* We must ask ourselves "whether there is a reasonable possibility that the . . . error [under the Confrontation Clause] moved the jury from a state of non-persuasion to one of persuasion on a particular issue." *Id.*

Although it is safe to assume Nurse Garcia's testimony about the positive lab results was important to the State's case to prove S.K. was sexually abused, the State constructed its case around S.K.'s credibility as the complaining witness. *See Ellison v. State*, 494 S.W.3d 316, 326 (Tex. App.—Eastland 2015, pet. ref'd) (stating improperly admitted evidence was important, but "not imperative to the State's case because the State presented other compelling evidence"); *Cone v. State*, 383 S.W.3d 627, 638 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (considering extensive evidence of intoxication as an alternative theory to blood-alcohol-content test admitted in violation of the Confrontation Clause). S.K. testified about Kou's sexual conduct with her, including mouth-to-genital and genital-to-genital contact. Patricia also testified about S.K.'s outcry statement describing Kou's sexual conduct with S.K. as including mouth-to-genital and genital-to-genital contact. The jury further heard Nurse Garcia's testimony that S.K. had reported genital-to-genital, mouth-to-genital, and hand-to-genital contact. Although the State's experts testified about the lab test results and Dr. Kissoon testified a nine-year-old child having genital herpes is highly indicative of sexual abuse, Dr. Kissoon also testified her "conclusion that [S.K.] was sexually abused is based mostly on [S.K.'s] disclosure of being sexually abused. It was a clear and consistent disclosure of sexual abuse." We disagree with Kou's characterization of Dr. Kissoon's ultimate opinion as having been "based . . . solely on the inadmissible lab analysts'

report." Although the admission of the lab test results supported the expert witnesses' ultimate opinion that S.K. was sexually abused, the expert witnesses could have provided their ultimate opinion that S.K. was sexually abused without testifying about the lab test results. *See* TEX. R. EVID. 705(d).

The testimony about the lab test results was not cumulative of any other direct evidence that S.K. had an HSV-1 infection, but the jury heard testimony from numerous witnesses about the progression of a herpes infection and the pimples, puss, and lesions on S.K.'s labia. *See Scott*, 227 S.W.3d at 690 (explaining harm analysis requires considering whether other evidence corroborated, contradicted, or was cumulative of improperly admitted evidence). The jury heard Nurse Garcia's testimony that the lesions on S.K.'s labia were not normal on a child, and based on her visual and physical examination, the lesions "looked concerning for [a herpes] infection" because "they looked like, you know, herpes lesions." Dr. Kissoon also testified about the progression of herpes symptoms, particularly after an initial or primary infection:

> So your primary infection in herpes is the most painful break that you have. So prior to having an eruption of vesicles, which is the fluid-filled blisters that you see, you may have itching and burning at the [site]. And then the vesicles erupt, and then those vesicles actually break. And then that -- those lesions, once the vesicles are there and the lesions break, they are very, very painful.

She also testified:

> Well, with herpes, usually it causes ulcers and ulcerations. They start off kind of like a pimple. Like . . . what [S.K.] has here at the very top on the mons pubis, the red dots, that is kind of how it starts off, like a little pimple, kind of a raised lesion. And then those raised lesions, then they -- they open, and they get -- they become like blisters. And they pop open and then become an ulcer, and so that is what herpes typically looks like on the skin.

Dr. Kissoon further testified a primary infection "is more painful and worse than subsequent infections." During the expert witness hearing, Kou objected to Nurse Garcia and Dr. Kissoon testifying to a herpes diagnosis because it was based solely on the lab test results. However, Kou

did not object to Nurse Garcia testifying about her observations or impressions before receiving the lab test results or to Dr. Kissoon's testimony about the typical progression of the herpes virus.

Kou also did not object to fact witnesses' testimony describing S.K.'s herpes-like symptoms. Marcia testified that on July 10, 2014, S.K. complained of itching and pain in her "private area," she observed a red rash on S.K.'s labia, and applying diaper rash cream was not effective. She testified she examined S.K.'s labia and saw what "looked like pimples." Marcia examined S.K.'s labia the following day, and the rash "looked redder. The pimples had . . . pus in them, and they started to pop." Nurse Garcia testified she examined S.K.'s labia on July 16, 2014, and S.K. had four scabbed lesions, "several yellow pus-filled lesions or blisters along that area," and "yellow pus-filled blisters that were also surrounded by some redness" on another part of her labia. Aside from testimony that S.K. tested positive for HSV-1, the jury heard impactful testimony from fact witnesses and expert witnesses about herpes and S.K.'s herpes-like symptoms.

We next consider the overall strength of the State's case. *See id.* S.K. testified about Kou's usual practice before engaging in sexual acts with her. Kou would quietly motion to her to go from the living room into his bedroom on Sunday mornings around 7:00 a.m. while the others in the house were asleep. She descriptively and consistently testified to genital-to-genital and mouth-to-genital contact. S.K. stated sometimes she would lie "on the floor, on the bed, or like on the chair or something." She testified that on July 4, 2014, there was an incident in his closet, and the trial court admitted a photograph showing Kou had a walk-in closet. S.K. also described Kou's penis as looking "[l]ike a banana." S.K. stated Kou would sometimes touch his penis during these incidents and when he did so, "he would go in the sink and then rinse it out. There was like white stuff coming out." She said she saw the "white stuff" come out "[m]ost of the time." S.K. described which of the two sinks in the double vanity in Kou's bedroom he had used to wash himself, and

she said that was "when he stops," and it was her "cue to . . . leave." S.K. stated Kou "started doing these things" to her when she was "[a]round five."

S.K.'s testimony about her outcry to Patricia was generally consistent with Patricia's testimony describing S.K.'s outcry.[2] S.K. and Patricia both testified that S.K. was crying; Patricia was shocked; Patricia closed the door of the room they were in; and Patricia did not tell S.K.'s parents immediately so as not to ruin S.K.'s birthday. Patricia also testified that after S.K.'s outcry, on a Sunday morning around 7:00-7:15 a.m., she hid under a blanket in the living room next to S.K. while S.K. was on the couch, and that she saw Kou approach S.K. in a manner consistent with how S.K. had described Kou's routine practice.

Nurse Garcia testified S.K. had reported genital-to-genital, mouth-to-genital, mouth-to-mouth, and hand-to-genital contact. Dr. Kissoon provided an expert opinion that S.K. was sexually abused and testified her opinion was based more so on the clarity and consistency of S.K.'s reports than on the lab test results.

Kou's primary defensive theory was that S.K. panicked when she noticed something was "not normal" and fabricated a story of sexual assault to avoid getting in trouble. *See id.* (explaining we must consider the evidence in relation to the defensive theories). Kou suggested during closing arguments that S.K. simply relayed a similar story of sexual abuse that Patricia had endured. Kou also argued Marcia's leading questions about the sexual assault led S.K. to just answer "yes." Kou also sought to discredit S.K.'s testimony based on S.K.'s three-year delay before making an outcry to Patricia. However, S.K. testified that when she was "seven or six," she tried to tell Marcia, but Marcia asked her several questions and S.K. did not "like that." S.K. also testified she thought she would get in trouble if she told her mother because when she was younger, "anything [she] said

---

[2] The Rule was invoked.

would get [her] in trouble." S.K. said she was not close with her mother, but was close with Patricia. Dr. Kissoon testified it is "very common" for children who have been sexually abused not to outcry immediately and "[i]t may take days, months, or even years." She explained reasons for a delayed outcry include the child not understanding what is happening, "be[ing] fearful of what is going to happen if they do tell," living with the abuser, and having feelings of love for the abuser. The only evidence supporting Kou's suggestion that S.K. relayed Patricia's sexual abuse was testimony that before S.K. made an outcry to Patricia, Patricia previously told S.K. that Patricia was sexually abused for three years. But Patricia testified "[n]obody knows" the details of her sexual abuse.

During closing arguments, Kou also focused on the absence of physical evidence. For example, Kou referred to Nurse Garcia's testimony that S.K.'s hymen was intact. But Nurse Garcia testified that once a child reaches puberty, there is an "influx of estrogen" that causes the hymen to get "fluffy." "So the estrogen allows that structure, the hymen, to be able to stretch. So a lot of the times there can be penetration without there being any injury to the hymen." Nurse Garcia further testified S.K.'s hymen was estrogenized. Kou also referred to S.K.'s testimony that during some of the incidents with Kou, S.K. was "on" a black pillow. There was evidence showing the black pillow underwent DNA testing, and the tests for semen were negative. It is reasonable to infer the jury did not rely on this evidence because none of the incidents S.K. described occurred in the room from which the black pillow was retrieved, and it is unclear from the evidence where exactly the black pillow was positioned during these incidents.

We next consider the State's closing arguments. *See id.* (explaining we must consider the extent to which the State emphasized the improper evidence). In its closing argument during the guilt-innocence phase of trial, the State argued S.K.'s reports of sexual abuse satisfied the elements of the "continuous sexual abuse of a child" offense, as defined in the jury charge. The State referred

to the herpes diagnosis twice. The first time the herpes diagnosis was referenced, the prosecution

stated:

> All the evidence in this case came from that witness stand, but the evidence isn't just [S.K.] telling you that the defendant was abusing her for three years, sexually abusing her for three years. It is the details in what was happening she is giving you, the way she is able to describe his penis. It's the way she is telling you how it hurt when he put his fingers inside her. It is the consistency that she gives you between what she tells [Patricia], what she told her mom, what she told the forensic interviewer, and what she told the sexual assault nurse examiner. Her story never wavered. It is consistent.
>
> And it is the fact that he had access also to [S.K.] on Sundays. ***It is the fact that he gave her herpes***. All of these things corroborate the fact that she was molested by this man for a period of three years. Right now is not the time to determine whether or not -- how a guilty verdict is going to affect him. Right now is about [S.K.]. It is about what he did to [S.K.]. It is about you holding him accountable and telling him that you believe [S.K.], telling [S.K.] you believe her, you believe everything that she said he did to her.

(emphasis added). When referring to the herpes diagnosis the second time, the State also referred

to Garcia's observations of the lesions on S.K.'s labia and Dr. Kissoon's testimony about the

general progression of herpes symptoms. Overall, the State's arguments based on the herpes

diagnosis did not comprise much of the State's closing during the guilt-innocence phase. Similarly,

in its closing argument during the punishment phase of trial, the State mentioned the herpes

diagnosis, but the State's arguments based on the herpes diagnosis did not comprise much of the

State's closing.[3]

Having considered all parts of the record, especially the significant amount of unobjected-

to testimony about S.K.'s herpes-like symptoms, we conclude there is not a reasonable possibility

that the trial court's admission of testimony about the positive lab test results and the herpes

diagnosis moved the jury from a state of non-persuasion to one of persuasion on the issue of Kou's

---

[3] The State presented no other evidence clearly pertaining to the herpes diagnosis during the punishment phase, but referred to the fact that S.K. would have to live with herpes during closing argument.

guilt or punishment. *See id.* Accordingly, we find beyond a reasonable doubt that the error did not

contribute to Kou's conviction or punishment. *See* TEX. R. APP. P. 44.2(a); *see Cone*, 383 S.W.3d

at 640-41.[4]

## CONCLUSION

We affirm the trial court's judgment.

Luz Elena D. Chapa, Justice

PUBLISH

---

[4] For purposes of our harmless-error review for the trial court's constitutional error, we need not rely on Gallegos's outcry-witness testimony, which we assumed was erroneously admitted. Even considering the cumulative effect of the errors, we determine beyond a reasonable doubt the trial court's errors did not contribute to the conviction or punishment. *See* TEX. R. APP. P. 44.2(a); *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) (noting "a number of errors may be found harmful in their cumulative effect").