**State's Motion for Leave to File Sur-Reply Brief Denied; Affirmed and Memorandum Opinion filed October 5, 2021.**



In The

# Fourteenth Court of Appeals

### NO. 14-20-00160-CR

### FRANCISCO BRALLAN ANAVISCA, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 208th District Court
Harris County, Texas
Trial Court Cause No. 1660617**

## M E M O R A N D U M   O P I N I O N

A jury found Appellant Francisco Brallan Anavisca guilty of aggravated sexual assault and assessed punishment at 80 years' confinement. *See* Tex. Penal Code Ann. § 22.021. Appellant appealed and, in three issues, asserts the trial court erred by (1) denying his request for a jury instruction on a lesser-included offense, (2) overruling his Confrontation Clause objections, and (3) denying his motion for mistrial. For the reasons below, we affirm.

## BACKGROUND

Appellant and Complainant met on MeetMe, an online social networking application. Complainant told Appellant she liked rap music and, after talking for a couple of weeks, Appellant and Complainant "made plans to meet up so [Complainant] could go to the [recording] studio." On October 15, 2016, Appellant and a friend drove to Henderson, Texas to pick up Complainant from her mother's house. After picking Complainant up at approximately 1:00 a.m., Appellant drove Complainant back to his home in Houston. Appellant was 25 years old at the time and Complainant was fifteen.

Complainant remained at Appellant's home for two days. On the second day, Appellant texted one of Complainant's friends to meet them at a nearby Pizza Hut to pick up Complainant. Appellant drove Complainant to the Pizza Hut; a police officer who had been tipped off by Complainant's friend also was waiting at the location. When Appellant and Complainant arrived, Appellant noticed the police officer's car and drove away. The officer initiated a traffic stop on Appellant's vehicle; Appellant pulled into a driveway, exited his vehicle, and ran away.

The police officer proceeded to drive Complainant to the police station. On the way, Complainant told the officer that Appellant made her have sex with him while she was at his house. Appellant was arrested shortly thereafter and charged with aggravated sexual assault of a child 14 to 17 years old.

Appellant proceeded to a jury trial in January 2020. The State presented testimony from seven witnesses regarding the incident involving Appellant and Complainant. The State also presented testimony from four other witnesses

regarding a separate extraneous offense involving Appellant and Beth.[1] After three days of testimony and evidence, the jury returned a verdict finding Appellant guilty of aggravated sexual assault of a child.

Appellant elected to have the jury assess punishment. After hearing testimony and evidence, the jury assessed punishment at 80 years' confinement. Appellant appealed.

### ANALYSIS

Raising three issues on appeal, Appellant asserts the trial court erred by:

1. denying his request for a jury instruction on the lesser-included offense of sexual assault;

2. overruling his Confrontation Clause objections to two witnesses' testimony regarding statements made by Beth, a non-testifying witness; and

3. denying his motion for mistrial after the testimony of a witness at the punishment phase addressing the meaning of Appellant's tattoos.

We address these issues individually below.

## I. Lesser-Included Offense of Sexual Assault

In his first issue, Appellant asserts he was entitled to a jury instruction on the lesser-included offense of sexual assault because "more than a scintilla of evidence was adduced" that would have permitted the jury to find Appellant was guilty only of sexual assault.

### A. Standard of Review and Governing Law

In a prosecution for an offense with lesser-included offenses, the jury may find the defendant not guilty of the greater offense but guilty of any lesser-included

---

[1] Because Beth was a minor when the extraneous offense occurred, we refer to her using a pseudonym. *See* Tex. R. App. P. 9.10(a).

offense. *See* Tex. Code Crim. Proc. Ann. art. 37.08. A charge on a lesser-included offense should be given when (1) the lesser-included offense is included within the proof necessary to establish the offense charged, and (2) there is some evidence in the record that would permit a jury to rationally find that, if the defendant is guilty, the defendant is guilty only of the lesser offense. *Sweed v. State*, 351 S.W.3d 63, 68 (Tex. Crim. App. 2011); *Tutson v. State*, 530 S.W.3d 322, 329-30 (Tex. App.— Houston [14th Dist.] 2017, no pet.).

To determine whether the lesser-included offense is included within the proof necessary to establish the charged offense, we compare the statutory elements and any descriptive averments in the indictment for the greater offense with the statutory elements of the lesser offense. *Sweed*, 351 S.W.3d at 68; *Tutson*, 530 S.W.3d at 329. This determination presents a question of law that does not depend on any evidence produced during trial. *Rice v. State*, 333 S.W.3d 140, 144 (Tex. Crim. App. 2011).

For the second part of the analysis, we evaluate whether some evidence exists from which a rational jury could acquit the defendant of the greater offense while convicting the defendant of the lesser-included offense. *Sweed*, 351 S.W.3d at 68; *Tutson*, 530 S.W.3d at 329-30. The evidence must establish the lesser-included offense as a "valid, rational alternative to the charged offense." *Sweed*, 351 S.W.3d at 68.

To make this determination, we review all the evidence introduced during trial; anything more than a scintilla of evidence entitles the defendant to a lesser-included offense charge. *Tutson*, 530 S.W.3d at 330. But although a "scintilla of evidence" presents a low threshold, it is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense. *Sweed*, 351 S.W.3d at 68. Rather, "'there must be some evidence directly germane to the lesser-included

4

offense for the finder of fact to consider before an instruction on a lesser-included offense is warranted.'" *Id.* (quoting *Skinner v. State*, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997)). If some evidence refutes or negates other evidence establishing the greater offense, or if the evidence presented is subject to different interpretations, then the standard is met and the instruction is warranted. *Id.*; *Tutson*, 530 S.W.3d at 330.

## B. Relevant Evidence

As necessary to this analysis, we summarize the evidence presented at trial regarding the events that took place between Appellant and Complainant.

Testifying at trial, Complainant said Appellant and one of his friends picked her up at her mother's house in Henderson. Complainant said she "brought a couple of bags" with her because she "didn't know how long [she] was going to be there." According to Complainant, they drove for "a long time" before arriving at "a white trailer house."

Complainant said she put her stuff in Appellant's bedroom after arriving at the house. Describing Appellant's bedroom, Complainant said Appellant had "two guns in the closet and then . . . a gun by the bed." Complainant also said Appellant had a "long" knife in the living room that was "kind of like a machete." At one point while she was at Appellant's house, Complainant recalled that Appellant grabbed the knife and told her "it would be easy for him to be able to cut [her] arm off with it."

Complainant testified that, shortly after arriving at Appellant's house, Appellant "ended up telling [her] to take [her] clothes off and he made [her] do oral and anal and regular sex." Complainant testified that she "didn't want to" have sex with Appellant and was "nervous" and "[s]cared."

5

Afterwards, Complainant said she and Appellant went back to the living room where Appellant started playing video games with his friend. According to Complainant, Appellant "played video games for a little bit" before he made her return to the bedroom with him and have anal sex. Complainant said Appellant "made [her] take a shower" afterwards. Complainant recalled that she was feeling "[r]eally upset and wanting to leave" but "was scared to try." Complainant said she and Appellant had "oral and vaginal" sex in the shower. Complainant testified that she and Appellant lay down on Appellant's bed afterwards and "it ended going to vaginal sex."

On her second day at Appellant's house, Complainant said she "wanted to go home" and "gave [Appellant] an offer that [she] would text one of [her] friends and . . . they could meet [Complainant] to pick her up." Complainant testified that Appellant messaged her friend to pick Complainant up at a nearby Pizza Hut. According to Complainant, she, Appellant, and Appellant's friend drove to the Pizza Hut, saw a police officer in the parking lot, and returned to Appellant's house.

Back at Appellant's house, Complainant said Appellant's friend "pulled [her] into his room" and "made [her] do vaginal [and] oral" sex. Complainant recalled that she felt "[r]eally upset" and "just wanted to not have to be there anymore."

Afterwards, Complainant said Appellant again drove her to the Pizza Hut and saw a police officer waiting for them. Complainant said the police officer started following Appellant's vehicle and Appellant "freaked out, pulled into a driveway and jumped out and ran." Complainant waited for the police officer and rode with him to the police station, where she was met by her aunt. Complainant said her aunt took her "to the hospital to get the rape kit done." Complainant said

6

she was "not really in [her] right mind at that point" and "was really upset and [] couldn't believe that [she] actually was away from there."

At the hospital, Complainant testified that the nurses "measured all the bruises and things that [were] on [her] body." Admitted during Complainant's testimony were pictures taken by her mother showing bruises and hickeys on Complainant's body. Complainant said the bruises were from Appellant and his friend, who were "rough" with her "[d]uring the sexual acts." Further describing Appellant's actions, Complainant said "he would hold [her] down and force [her] to do whatever he wanted [her] to do." Complainant also recalled that Appellant would "hold[] [her] throat down" with his hand during sex. Complainant said she asked Appellant "to stop" "[e]very time before he would start" having sex with her. Complainant said she was "afraid" because of "all the weapons and how forceful [Appellant] was."

Testifying at trial, Deputy Sampson said he initiated the traffic stop on Appellant's vehicle before Appellant ran away from the scene. Deputy Sampson testified that he drove Complainant to the police station in his car and recalled that Complainant was "nervous", "appeared upset", and "was scared." On the way to the police station, Deputy Sampson said Complainant "became very upset, started crying, and stated she needed to tell me something." Complainant told Deputy Sampson she had sex with Appellant. When Deputy Sampson asked Complainant if it "was willingly", Complainant "stated no."

Emergency room nurse Rachel Fischer performed a sexual assault exam on Complainant after Complainant arrived at the hospital. Reading from the sexual assault examination form she filled out during the exam, Fischer provided Complainant's account of what occurred while she was at Appellant's house. According to Fischer, Complainant told her Appellant had oral, vaginal, and anal

sex with her and choked her during intercourse "many different times".  Fischer also said Complainant told her she "was scared because [Appellant and his friend] had so many guns and stuff."

Describing Complainant's appearance during the exam, Fischer testified that Complainant "leaned forward hugging her arms around her waist and she looked down while giving her history.  Her voice was shaking.  She squeezed her legs together during the exam."  Fischer also said Complainant "didn't want to look at me as she was telling me what happened."  Fischer testified that there were "various bruises [and] abrasions on [Complainant's] thighs, the knees, the breasts, [and] the abdomen."  Fischer said these injuries were consistent with the biting and choking Complainant reported.  Fischer also testified that Complainant had pain in and abrasions to her genitals.  Fischer said the extent of Complainant's genital injuries "is very rare to see."

Finally, forensic DNA analyst Zury Phillips testified with respect to the testing and analysis done on DNA samples recovered from Complainant and her clothing.  Phillips testified that, based on her analyses of several items of evidence, there was "very strong support" for the proposition that Appellant was a contributor to the DNA mixture on swabs taken from Complainant's genitals, neck, breasts, and clothing.

## C.    Application

Turning to the first step in our analysis, the parties correctly agree that, as charged, sexual assault is a lesser-included offense of aggravated sexual assault. As relevant here, a person commits sexual assault if, "regardless of whether the person knows the age of the child at the time of the offense, the person intentionally or knowingly: . . . causes the sexual organ of a child to contact . . . [the] sexual organ of another person, including the actor".  Tex. Penal Code Ann.

8

§ 22.011(a)(2)(C). Aggravated sexual assault requires proof of the same elements except that, as charged, the aggravating factor required proof that Appellant by acts or words placed Complainant in fear of serious bodily injury. *See id.* § 22.021(a)(1)(B), (a)(2)(A)(ii); *see also Junious v. State*, No. 14-09-00400-CR, 2010 WL 3946057, at *3 (Tex. App.—Houston [14th Dist.] Sept. 28, 2010, pet. ref'd) (mem. op., not designated for publication).

For the second step, we examine whether the record contains any evidence directly germane to the lesser-included offense, such that the lesser-included offense was a valid, rational alternative to the charged offense. *See Sweed*, 351 S.W.3d at 68. We conclude that showing is not made here.

Specifically, the record does not contain any evidence showing Complainant was not in fear of serious bodily injury during the sexual assaults. Complainant testified that Appellant made her have sex with him numerous times, including oral, vaginal, and anal sex. Complainant said Appellant was "rough" during the sexual acts and would "hold[] [her] throat down" with his hand. Complainant said she asked Appellant "to stop" "[e]very time before he would start" having sex with her. According to Complainant, at various times she felt "nervous", "[s]cared", and was "[r]eally upset and wanting to leave" but "was scared to try." Complainant also recalled that Appellant's house had numerous guns and a long, machete-like knife. Complainant said she was "afraid" because of "all the weapons and how forceful [Appellant] was."

The fear Complainant described is corroborated by other evidence. According to Deputy Sampson, during the drive to the police station Complainant was "nervous", "appeared upset", and "was scared." Deputy Sampson said Complainant "became very upset, started crying, and stated she needed to tell me something." Deputy Sampson testified that Complainant told him she had sex with

Appellant against her will.

Likewise, Fischer recalled that, while Complainant was describing the sexual assault, Complainant said she "was scared because [Appellant and his friend] had so many guns and stuff." Fischer also testified that Complainant "leaned forward hugging her arms around her waist and she looked down while giving her history. Her voice was shaking. She squeezed her legs together during the exam." Fischer testified that there were bruises and abrasions on Complainant's body consistent with the biting, grabbing, and choking she reported experiencing. Fischer also testified that Complainant had pain in and abrasions to her genitals and that the extent of Complainant's genital injuries "is very rare to see."

No evidence was introduced at trial to refute or negate this evidence establishing Complainant's level of fear during her encounters with Appellant. Similarly, this evidence does not support any alternative conclusions regarding whether Complainant was in fear of serious bodily injury. Complainant described several sexual assaults that took place over two days that left her bruised and in pain; these assaults occurred in an unfamiliar house that contained guns and a knife. Complainant's fragile emotional state after the assaults was testified to by Deputy Sampson and Fischer. Fischer also testified regarding the types of injuries Complainant sustained and their extent. This evidence would not permit a rational jury to acquit Appellant of aggravated sexual assault while convicting him only of the lesser-included offense of sexual assault. *See id*.; *Tutson*, 530 S.W.3d at 329-30. Accordingly, the trial court did not err by denying Appellant's request for a jury instruction on the lesser-included offense of sexual assault.

We overrule Appellant's first issue.

## II.  Confrontation Clause

In his second issue, Appellant asserts the trial court erred by overruling his Confrontation Clause objections to two witnesses' testimony regarding statements made by Beth, a non-testifying witness.  Specifically, the witnesses testified regarding Beth's statements that Appellant sexually assaulted her in an incident that occurred in August 2016.[2]

### A.  Standard of Review and Governing Law

The Sixth Amendment provides that, in all criminal prosecutions, the accused shall have the right to be confronted by the witnesses against him.  *See* U.S. Const. amend. VI; *Crawford v. Washington*, 541 U.S. 36, 51 (2004).  The Sixth Amendment right of confrontation applies not only to in-court testimony but also to out-of-court statements that are testimonial in nature.  *Crawford*, 541 U.S. at 51; *Langham v. State*, 305 S.W.3d 568, 575 (Tex. Crim. App. 2010).  The Confrontation Clause "provides a simple yet unforgiving rule:  the State may not introduce a testimonial hearsay statement unless (1) the declarant is unavailable to testify and (2) the defendant had a prior opportunity to cross-examine the declarant."  *Lee v. State*, 418 S.W.3d 892, 895 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).  Whether a particular statement is testimonial is a question of law we review *de novo*.  *Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006).

The Court of Criminal Appeals has delineated three types of testimonial statements:  (1) "ex parte in-court testimony or its functional equivalent", *i.e.*, "pretrial statements that declarants would reasonably expect to be used

---

[2] Evidence regarding this extraneous offense was admitted pursuant to Texas Code of Criminal Procedure article 38.37.  *See* Tex. Code Crim. Proc. Ann. art. 38.37 § 1(b).  Prior to admitting this evidence, the trial court held a hearing outside of the jury's presence and concluded the evidence would be adequate to support a finding that Appellant committed this separate offense beyond a reasonable doubt.  *See id*. art. 38.37 § 2(a).

prosecutorially;" (2) "extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, or prior testimony;" and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Langham*, 305 S.W.3d at 576.

The following principles are helpful in determining whether particular statements are testimonial: (1) testimonial statements are official and formal in nature, (2) interaction with the police initiated by a witness or the victim is less likely to result in testimonial statements than if initiated by the police, (3) spontaneous statements to the police are not testimonial, and (4) responses to preliminary questions by police at the scene of the crime while police are assessing and securing the scene are not testimonial. *Amador v. State*, 376 S.W.3d 339, 342-43 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd); *Dixon v. State*, 244 S.W.3d 472, 482 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd).

A Confrontation Clause violation is a constitutional error that requires reversal unless we conclude beyond a reasonable doubt that the error was harmless. *See Davis v. State*, 203 S.W.3d 845, 849 (Tex. Crim. App. 2006); *Smith v. State*, 436 S.W.3d 353, 372 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd); *see also* Tex. R. App. P. 44.2(a). The critical inquiry is not whether the evidence supported the verdict absent the erroneously-admitted evidence, but rather "the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations." *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007).

To determine whether the admission of the statement was harmless beyond a reasonable doubt, we consider (1) the importance of the statement to the State's case; (2) whether the statement was cumulative of other evidence; (3) the presence or absence of evidence corroborating or contradicting the statement on material

12

points; and (4) the overall strength of the State's case. *Davis*, 203 S.W.3d at 852; *Smith*, 436 S.W.3d at 372. We also may consider the source and nature of the error, the extent of the State's emphasis on the evidence, the relative weight the jury may have assigned to the evidence as compared with the balance of remaining evidence relevant to the issue, and any other factor contained in the record that may shed light on the probable impact of the evidence on the minds of average jurors. *Cone v. State*, 383 S.W.3d 627, 637 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd).

## B. Relevant Evidence

For our analysis of this issue, we focus on evidence pertaining to the extraneous offense involving Appellant and Beth.

Nurse Fischer testified regarding the sexual assault examination she performed on Beth on August 8, 2016, and the forensic examination report she completed during the examination. According to Fischer, Beth was 15 years old when she came in for the examination. Discussing Beth's medical history, Fischer read her record of Beth's statements regarding the assault. According to Fischer, Beth said she met Appellant on an online dating application, met up with him once, and had consensual sex with him in his car. Fischer said Beth discussed that she met Appellant for a second time a few days later and told him she did not want to have sex. Beth stated that Appellant pointed a gun at her and said "he was gonna get what he wants." Beth told Fischer that Appellant forced her to have oral sex with him in the car before driving her to an abandoned house. Once in the house, Beth recalled that Appellant forced her to have oral, vaginal, and anal sex with him; Beth said she tried to scream but Appellant told her to "[s]hut up or he will kill" her and repeatedly "[c]hok[ed] [her] every time [she] made a noise."

Fischer also testified regarding the injuries on Beth's body, including bruises

13

on her neck, chest, and arms. Fischer said the bruises were consistent with Beth's statements regarding what occurred between her and Appellant. Fischer also noted that Beth had "a hoarse and raspy voice" as she was talking along with neck pain and pain while swallowing, which were consistent with her reports that she was choked. In addition, Fischer testified regarding the injuries to Beth's genitals.

Next, forensic DNA analyst Jessica Powers testified with respect to the testing and analysis done on DNA samples recovered from Beth and her clothing. Phillips testified that, based on her analyses of the genetic material recovered from Beth's genitals, the probability that Appellant was a contributor to that genetic material was significantly higher than if the material had come from another individual.[3]

Finally, Officer Eason testified about his interactions with Beth the day of the assault. According to Officer Eason, he received a call in the early-morning hours of August 8, 2016, regarding an assault and proceeded to the reported location. Officer Eason testified that he found Beth sitting outside on the curb; Officer Eason recalled that Beth was "visibly upset" and "crying, shaking." Officer Eason also stated that Beth had "bruising around her neck."

According to Officer Eason, Beth told him "that she was raped" and that "the suspect penetrated both her anus and vagina." Officer Eason said Beth reported that she was raped at two different locations: first "down the street from where she was picked up from" and later at the location to which Officer Eason

---

[3] Specifically, for the first tested vaginal swab, Phillips said Appellant could not "be excluded as a possible contributor to the foreign male DNA profile deduced from this mixture. The probability that a randomly chosen, unrelated individual would be included as a possible contributor to the foreign male DNA profile deduced from this mixture is approximately one in 55 quintillion individuals." For the second tested vaginal swab, Phillips testified that Appellant also could not "be excluded as a possible contributor to the major component. The probability that a randomly chosen unrelated individual would be included as a possible contributor to the major component is approximately one in 26 octillion individuals".

responded. Officer Eason testified that Beth informed him the suspect had a gun that he threatened her with during the assault. According to Officer Eason, Beth also told him the suspect had choked her. After gathering this information, Officer Eason said he drove Beth to the hospital.

## C. Application

Appellant's Confrontation Clause issue challenges the testimony from Fischer and Officer Eason regarding what Beth told them about the assault. We consider these individuals' testimony separately.

### 1. Fischer

As discussed above, nurse Fischer testified regarding the sexual assault examination she performed on Beth and read Beth's account of the sexual assault directly from her forensic examination form.[4] Appellant asserts that these constitute testimonial statements and, because Beth did not testify at trial, the statements should have been excluded under the Confrontation Clause.

In *Melendez-Diaz v. Massachusetts*, the United States Supreme Court held that medical records, created for treatment purposes, are not "testimonial" in nature within the meaning of *Crawford*. 557 U.S. 305, 312 (2009). Following this line of reasoning, "[v]irtually all Texas courts that have considered the issue have concluded that when a patient gives a verbal history to a sexual assault nurse examiner or other medical professional during a sexual assault exam for the purpose of receiving medical treatment, the history is not considered testimonial within the context of *Crawford*." *Ervin v. State*, No. 08-15-00025-CR, 2017 WL

---

[4] Before Fischer began this line of testimony, defense counsel objected and raised several grounds for the testimony's exclusion, including the Confrontation Clause. The trial court overruled defense counsel's objection, thereby preserving Appellant's Confrontation Clause challenge for appellate review. *See* Tex. R. App. P. 33.1(a)(1).

3614237, at *11 (Tex. App.—El Paso Aug. 23, 2017, pet. ref'd) (not designated for publication); *see id.* (collecting cases); *see also Dobbs v. State*, No. 02-17-00246-CR, 2018 WL 3060093, at *3 (Tex. App.—Fort Worth June 21, 2018, pet. ref'd) (mem. op., not designated for publication) (noting that "[v]irtually all" Texas Courts have concluded that, when a patient gives a verbal history during a sexual assault exam, the history is not considered testimonial within the context of *Crawford*).

The Austin Court of Appeals recently addressed a similar issue in a sexual assault case, in which a sexual assault nurse examiner testified regarding statements made by the complainant regarding the assault. *See Murray v. State*, 597 S.W.3d 964, 973-74 (Tex. App.—Austin 2020, pet. ref'd). There, the complainant was admitted to the hospital for a suspected drug overdose and, two days after she was admitted, underwent a sexual assault exam. *Id.* at 968-69. During the exam, the complainant told the nurse she had been sexually assaulted by the defendant. *Id.* at 969.

On appeal, the defendant argued that the nurse's testimony regarding the complainant's statements violated his Confrontation Clause rights. *See id.* at 973. Citing *Melendez-Diaz*, the court of appeals rejected this argument and noted that, because the nurse's testimony "establishe[d] that the primary purpose of [the complainant's] statements during the patient history was for medical treatment, making the statements was non-testimonial." *Id.* at 974; *see also Bohanna v. State*, No. 14-19-00936-CR, 2021 WL 1917663, at *6 (Tex. App.—Houston [14th Dist.] May 13, 2021, no pet. h.) (mem. op., not designated for publication) (adopting *Murray*'s reasoning in a similar case).

Guided by these authorities, we conclude that Beth's statements to Fischer during the sexual assault examination were non-testimonial. Beth arrived at the

16

hospital shortly after the assault occurred and underwent a sexual assault exam administered by Fischer. Testifying at trial, Fischer stated that she collected from Beth information about the assault "for medical purposes" and "[t]o properly diagnose and treat" Beth. Broadly describing her role in this process, Fischer testified that "a sexual assault nurse examiner is a registered nurse that has been trained to provide comprehensive care to sexual assault patients, trauma informed, able to do the health and welfare needs of the patient while taking a trauma-informed approach for someone who has gone through a trauma such as sexual assault." Similar to *Murray*, this evidence shows that the primary purpose of Beth's statements to Fischer was for medical treatment; therefore, the statements are non-testimonial. *See Murray*, 597 S.W.3d at 973-74; *see also Bohanna*, 2021 WL 1917663, at *5-6 (evidence of two extraneous sexual assaults was admitted during the punishment phase of the appellant's trial; concluding the nurses' testimony regarding the extraneous-offense complainants' statements about the assaults was non-testimonial, this court noted that "the examinations and obtainment of a verbatim history from each complainant was for the purpose of diagnosis and treatment").

We overrule Appellant's Confrontation Clause issue with respect to Fischer's testimony.

### 2. Officer Eason

As discussed above, Officer Eason testified about Beth's statements to him when he responded to the call reporting the assault. Specifically, Officer Eason testified that Beth told him she was raped, that the suspect choked her during the assault, and that the suspect threatened her with a gun. Appellant asserts that these were testimonial statements and, because Beth did not testify at trial, the trial court

17

erred by not sustaining his Confrontation Clause objection.[5]

We presume without deciding that the trial court erred by overruling Appellant's Confrontation Clause objection to Officer Eason's testimony regarding Beth's statements to him. We nonetheless conclude beyond a reasonable doubt that the error was harmless. *See* Tex. R. App. P. 44.2(a).

First, this testimony addressed an extraneous offense rather than the aggravated sexual assault for which Appellant was on trial. The jury was instructed as follows with respect to the extraneous offense:

> You are further instructed that if there is any evidence before you in this case regarding the defendant's [sic] committing an alleged offense or offenses other than the offense alleged against him in the indictment in this case, you cannot consider such evidence for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offense or offenses, if any, and even then you may only consider the same in determining intent, preparation or plan, if any, in connection with the offense, if any, alleged against him in the indictment and for no other purpose.

*See also* Tex. Code Crim. Proc. Ann. art. 38.37 § 2(a)(1).

Officer Eason's statements regarding what Beth told him were cumulative of other evidence pertaining to the extraneous offense. Specifically, Fischer testified to the same regarding Beth's account of what transpired between her and Appellant. Both Fischer and Officer Eason testified about Beth's injuries and Officer Eason noted that, when he first arrived on the scene, Beth was "visibly upset" and "crying, shaking." Numerous photographs of Beth's injuries also were admitted into evidence. DNA analyst Powers testified that, based on her analyses

---

[5] Before Officer Eason began this line of testimony, defense counsel objected and raised several grounds for the testimony's exclusion, including the Confrontation Clause. The trial court overruled defense counsel's objection, thereby preserving Appellant's Confrontation Clause challenge for appellate review. *See* Tex. R. App. P. 33.1(a)(1).

18

of the genetic material recovered from Beth, the probability that Appellant was a contributor to that genetic material was significantly higher than if the material had come from another random individual. This evidence, considered in conjunction with the challenged statements, supports the conclusion that the challenged statements were not a contributing factor in the jury's deliberations.

Moreover, the overall strength of the State's case with respect to the charged offense was strong. Complainant testified about her interactions with Appellant and said he repeatedly sexually assaulted her over a two-day period; Complainant identified Appellant in court as the person who assaulted her. Complainant also said Appellant choked her during the assaults and left bruises and abrasions on her body. Numerous photographs were admitted into evidence showing bruises on Complainant's body.

Complainant's testimony was corroborated by testimony from other witnesses. First, Deputy Sampson testified regarding his interactions with Complainant after he found her in Appellant's vehicle. Deputy Sampson recalled that Complainant was "nervous", "appeared upset", and "was scared." According to Deputy Sampson, Complainant told him she had sex with Appellant against her will.

Second, nurse Fischer testified regarding the sexual assault exam she performed on Complainant. Fischer said Complainant provided the same account regarding what occurred between her and Appellant. Fischer also testified Complainant told her she "was scared because [Appellant and his friend] had so many guns and stuff." According to Fischer, Complainant had bruises, abrasions, and pain on her body consistent with the injuries she had reported.

Finally, DNA analyst Phillips testified regarding her analyses of several items of evidence and concluded there was "very strong support" for the

proposition that Appellant was a contributor to the DNA mixture on swabs taken from Complainant's genitals, neck, breasts, and clothing. The strength of this evidence pertaining to the charged offense reinforces our conclusion that Officer Eason's testimony regarding Beth's statements to him was likely not a contributing factor in the jury's deliberations.

We overrule Appellant's Confrontation Clause issue with respect to Officer Eason's testimony.

## III. Motion for Mistrial

In his final issue, Appellant asserts the trial court erred by denying his motion for mistrial during the punishment phase. Appellant moved for a mistrial after one of the State's experts testified regarding the significance of Appellant's tattoos.

### A. Standard of Review and Governing Law

We review the denial of a motion for mistrial for an abuse of discretion. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). When deciding whether the trial court abused its discretion, we examine the particular facts of the case. *Green v. State*, 554 S.W.3d 785, 790 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (citing *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999)). "A mistrial is an appropriate remedy in 'extreme circumstances' for a narrow class of highly prejudicial and incurable errors." *Ocon*, 284 S.W.3d at 884 (quoting *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (en banc)).

In deciding whether to grant a mistrial, the trial court undertakes an appellate function and "determin[es] whether improper conduct is so harmful that the case must be redone." *Hawkins*, 135 S.W.3d at 77. Our review of the trial court's ruling on a motion for mistrial balances three factors: "(1) the severity of the

20

misconduct (prejudicial effect), (2) curative measures, and (3) the certainty of the punishment assessed absent the misconduct (likelihood of the same punishment being assessed)." *Id.*

With respect to witness testimony, ordinarily a prompt instruction to disregard will cure any error associated with an improper question and answer. *Green*, 554 S.W.3d at 790 (citing *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000) (en banc)). Similarly, "inadmissible evidence can be rendered harmless if other evidence is admitted at trial without objection and it proves the same fact that the inadmissible evidence sought to prove." *Harris v. State*, 164 S.W.3d 775, 783 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (internal quotation omitted).

## B. Relevant Evidence

Seven witnesses testified at Appellant's punishment hearing. The first witness, Anne, testified regarding an incident in which Appellant sexually assaulted her. Four other witnesses testified with respect to this incident, including Anne's father, Anne's sexual assault nurse examiner, the forensic DNA analyst who analyzed the evidence in the case, and the investigating detective.

Officer Moore, a canine supervisor with the Harris County Sheriff's Office, was the sixth witness to testify. According to Officer Moore, he and his dog helped apprehend Appellant after Appellant ran from his vehicle the day he was attempting to drop Complainant off at Pizza Hut. Officer Moore testified that Appellant was found hiding under a trailer home and arrested at the scene. During Officer Moore's testimony, numerous photographs of Appellant taken shortly after his arrest were admitted into evidence. The photographs show several tattoos on Appellant's body including: (1) "MS X3" on his lower back; (2) "Thug" on his upper left arm; (3) "No Bitch Feel My Pain" on his lower right arm; (4) "M S" on

his chest; (5) a hand folded into a sign resembling horns with "13" on the middle knuckles on the left side of his chest; and (6) "Original Killa From Honduras" on his lower abdomen.

Detective Rivas was the last witness to testify. Detective Rivas said that he has worked in the Houston Police Department's gang division for eight years and "specifically investigate[s] MS-13 members". Detective Rivas said "MS-13 stands for 'Mara Salvatrucha trece,' which translates to the Salvadorian gang. The 13 represents their allegiance to the Mexican Mafia."

Detective Rivas said MS-13 "follow[s] a motto [that] includes kill, rape, and control". Discussing the requirements for MS-13 members, Detective Rivas testified that "MS-13 recognizes members of homeboy, hold a rank of homeboy, and above. They don't take into consideration the guys that are trying to achieve that rank. And to become a homeboy, you have to have many murders under your belt." Detective Rivas testified that MS-13 members may be identified by "tattoos, their slang, [and] certain words that they use within the members." Discussing the MS-13's "recruitment process," Detective Rivas testified that "[a] lot of it is they try to see if they are true to their barrio, which refers to their neighborhood and if they are willing to conduct these killings as well and identifying rival gang members." When asked what makes MS-13 "so dangerous compared to other gangs", Detective Rivas said it is the gang's "willingness to conduct these gruesome murders".

Based on Appellant's tattoos, Detective Rivas opined that Appellant is a member of MS-13. Viewing specific photographs of Appellant's tattoos, Detective Rivas testified that the "M S" on Appellant's chest and the hand gesture on the left side of Appellant's chest reference MS-13. When asked what these tattoos "mean", Detective Rivas said: "For me it means these tattoos that he ha[s] on

22

there, he has to hold the rank of homeboy and above to have them and which, as I stated earlier, requirements are that he has a couple of murders under his belt . . . ." Defense counsel objected to this response. Sustaining the objection, the trial court instructed the jury to "disregard the testimony with regard to murders." The trial court denied defense counsel's motion for a mistrial.

On cross-examination, defense counsel asked Rivas if he was "saying that everybody that is a MS-13 member is a killer?" Rivas replied: "Who has the tats, yes; and they are trying to achieve the rank of homeboy, yes."

## C. Application

We conclude the trial court's denial of Appellant's motion for mistrial does not constitute an abuse of discretion. *See Ocon*, 284 S.W.3d at 884.

First, after the trial court sustained Appellant's objection to Rivas's testimony opining that Appellant "has a couple of murders under his belt", the trial court promptly instructed the jury to disregard the testimony with regard to the referenced murders. A prompt instruction to disregard generally is sufficient to cure any error associated with witness testimony. *See Green*, 554 S.W.3d at 790; *see also Herrero v. State*, 124 S.W.3d 827, 836 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ("A prompt instruction to disregard will ordinarily cure error associated with an improper question and answer regarding extraneous offenses.").

Second, the substance of the objected-to response was admitted through other evidence to which Appellant did not object. *See Harris*, 164 S.W.3d at 783. Detective Rivas testified that MS-13 "follow[s] a moto" that includes killing and, in contrast to other gangs, evidences a "willingness to conduct these gruesome murders." According to Detective Rivas, MS-13 only recognizes "a rank of homeboy[] and above" and, to become a "homeboy", "you have to have many

23

murders under your belt." Detective Rivas said that members of MS-13 may be identified by their tattoos and, based on Appellant's tattoos, he opined that Appellant is a member of MS-13, *i.e.*, a "homeboy". This unobjected-to line of testimony permits the inference that Appellant, as a member of MS-13, has committed murders.

Similarly, on cross-examination, defense counsel asked Rivas if he was "saying that everybody that is a MS-13 member is a killer?" In response, Rivas said "[w]ho has the tats, yes".

Based on this record, we conclude the trial court's denial of Appellant's motion for mistrial does not constitute an abuse of discretion.

## CONCLUSION

We affirm the trial court's judgment.


/s/ Meagan Hassan
Justice


Panel consists of Chief Justice Christopher and Justices Hassan and Poissant.
Do Not Publish — Tex. R. App. P. 47.2(b).

24